HURON ENVIRONMENTAL ACTIVIST LEAGUE; Safe Cement Alliance of Texas; Desert Citizens Against Pollution; Adans for a Clean Environment; Sierra Club; and Environmental Technology Council, Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Defendant.

Civ. A. No. 95–2124 (CRR).

United States District Court, District of Columbia.

Feb. 28, 1996.

---

David R. Case and Eli D. Eilbott of the Environmental Technology Council, Washington, DC, for plaintiffs.

Eric F. Goulian and Anne L. Weisman, Civil Division, United States Department of Justice, with whom Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney for the District of Columbia, and Hale W. Hawbecker, Office of the General Counsel, United States Environmental Protection Agency, were on the briefs, for defendant.

Richard G. Stoll of Freedman, Levy, Kroll & Simonds, Washington, DC, for the movants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### INTRODUCTION

Before the Court in the above-captioned case are two sets of pleadings. The first concerns whether two industry groups—the American Portland Cement Alliance ("APCA") and the Cement Kiln Recycling Coalition ("CKRC")—which have been involved in a series of meetings with the defendant concerning the regulation of Cement Kiln Dust ("CKD") under the Resource Conservation and Recovery Act ("RCRA") are entitled to intervene. In response to the movants' Motion to Intervene, the plaintiffs filed an Opposition; the movants subsequently filed a Reply thereto. The second set consists of cross motions for summary judgment filed by the parties and the movants, oppositions thereto, and replies. Upon consideration of the entire record herein and the applicable law, the Court shall grant the movant's Motion to Intervene and the defendant's Motion for Summary Judgment.

### BACKGROUND [1]

Cement Kiln Product is a by-product of the manufacturing process for cement, which consists of gypsum and cement "clinker" crushed together. Cement "clinker" is produced by feeding a mixture of pulverized limestone, shale and other earthen materials into a cement kiln. In the kiln, most of the material becomes "clinker" product. However, some of the mixture is carried out of the kiln with exhaust gases. This material constitutes CKD; air pollution control devices aim to capture it.

In 1980, Congress included CKD waste along with other types of materials derived from mined earthen materials in a unique RCRA category. The so-called "Bevill Amendment" to RCRA, located at 42 U.S.C. § 6921(b)(3) and 6982(o ), established a regulatory process that EPA must undertake re-

garding such waste. *See Horsehead Resource Development Co., Inc. v. Browner,* 16 F.3d 1246, 1254 (D.C.Cir.1994) (reviewing development of the Bevill Amendment).

The Bevill process prohibits EPA from issuing regulations for "high volume, low toxicity" wastes such as CKD under RCRA's "Subtitle C" hazardous waste regime unless EPA considers numerous factors, such as the nature of the risks associated therewith, the economic impact of any such regulation, and alternatives to regulation under Subtitle C. 42 U.S.C. §§ 6921(b)(3)(A), 6982(o ). The initial step in the Bevill process requires EPA to issue a Report to Congress. *Id.* at § 6982(o ). After the consideration of public comments regarding the Report, EPA then publishes a "determination" in the Federal Register, accompanied by an "explanation and justification" regarding its decision whether to further regulate a particular waste. *Id.* at § 6921(b)(3)(C). EPA issued a report regarding CKD on December 31, 1993. 59 Fed.Reg. 709 (1994).

As EPA considered the record for its CKD determination, the movants urged it to determine that no further RCRA controls are warranted; the plaintiffs urged the EPA to arrive at a contrary decision. Although the plaintiffs' position ultimately prevailed, EPA did not, as the plaintiffs had urged, distinguish CKD produced by kilns that burn hazardous waste fuel ("HWF") from that produced by kilns that use other fuels.[2] Notwithstanding the plaintiffs' urging that EPA impose immediate and full RCRA hazardous waste regulation on kilns that burn HWF (while leaving all other cement kilns alone), EPA found no significant difference in the risks presented in comparing CKD from kilns that burn HWF with those that do not. *Id.* at 7369. EPA also noted that the CKD from kilns that burn HWF is already subject to full regulation as a RCRA hazardous waste if it fails testing requirements set forth in EPA's regulations. *Id.*[3]

---

1. Except as otherwise noted, all facts are drawn from the parties' Joint Statement of Material Facts Not In Dispute, submitted in accordance with Rule 108(h) of the Rules of the United States District Court for the District of Columbia.

2. The CKD emissions from cement kilns that burn HWF is regulated under the so-called "boiler and industrial furnace" or "BIF" Rules under RCRA. 40 C.F.R. § 266.112.

3. Our Court of Appeals addressed the treatment of CKD produced by HWF-burning kilns under

EPA based its determination on its conclusion that there was a need for additional federally-enforceable controls on potential groundwater exposure from CKD disposal practices; EPA found "only low or negligible risk potential" from risk assessments based on direct exposure pathways.

Together with its determination that "additional control of [CKD] is warranted in order to protect the public from human health risks and to prevent environmental damage resulting from current disposal of this waste . . .", 60 Fed.Reg. 7366, EPA announced its intention to conduct a series of meetings with "interested parties, including industry, government, and public interest groups [in order] to solicit information and approaches that will facilitate the Agency's analysis of regulatory options . . ." 60 Fed.Reg. 7376.[4] Thereafter followed a series of meetings with various industry and public interest groups.

EPA conducted a briefing with regards to its regulatory determination on February 2, 1995. Thereafter, one or two members of APCA indicated to EPA that they were considering whether to submit a proposal for an enforceable agreement between EPA and APCA regarding CKD waste.

On March 8, 1995, EPA met with the Association for Responsible Thermal Treatment ("ARTT"), a trade association representing incinerator companies. Representatives of ARTT expressed their view that

CKD waste should be listed as a hazardous waste under RCRA Subtitle C.

On March 22, 1995, EPA met with APCA and CKRC whereupon the two trade associations proposed that, in lieu of issuing formal regulations, EPA enter into an enforceable agreement with cement manufacturers that would impose technical requirements for the management and disposal of CKD waste. A draft agreement was submitted to the defendant. *See* Enforceable Agreement for Management of Cement Kiln Dust Waste, attached to Complaint as Exhibit A. EPA attendees agreed to review the industry proposal and respond at a later date.

EPA met again with APCA and CKRC on April 6, 1995, and presented them with a preliminary list of technical questions and issues identified by EPA in response to the industry's proposal. See Preliminary Questions and Issues: Cement Industry's Proposed Enforceable Agreement, attached to Complaint as Exhibit C. EPA informed APCA representatives that it would actively consider the proposed agreement, but that there were technical, legal, and enforcement issues that needed to be addressed. EPA also informed APCA representatives that Agency rulemaking activities would be suspended pending consideration of the proposed agreement and that it would present the proposed agreement to other interested parties for comment.

---

RCRA in *Horsehead, supra. See Horsehead,* 16 F.3d at 1254–61. In that case, several of the plaintiffs in the instant case challenged EPA's failure to more stringently regulate CKD from HWF-burning kilns, while movant CKRC argued that EPA's regulation thereof was excessive. The Court of Appeals rejected both challenges. *Id.*

4. Therein EPA stated that

[it] believes that the development of regulations under multiple statutes (without duplication among regulatory programs) that adequately address the risks identified in the RTC, yet are economically affordable to the industry, should involve participation by all interested parties. To this end, EPA is announcing a regulation development process designed to encourage involvement by all stakeholders. . . . This process will be directed towards development of environmentally protective regulations that provide for highly flexible methods to administer and implement

them. The Agency's concern for minimizing the burden on State and local regulatory authorities and minimizing compliance costs and resource burdens on the regulated community will be an important principle in the regulation development process.

EPA will begin this process by conducting a series of meetings with interested parties, including industry, government, and public interest groups. The initial meetings with the parties will be used to solicit technical information and approaches that will facilitate the Agency's analysis of regulatory options (e.g., CKD management technologies, cost information, and economic information). The Agency plans to conduct the initial meetings during the spring and summer of 1995. Before these meetings are held, the Agency will identify specific questions and issues on which the Agency would like to receive information.
60 Fed.Reg. at 7376.

Shortly after the April 6, 1995 meeting, EPA forwarded copies of the proposal to other interested parties, including plaintiff Huron Environmental Activist League ("HEAL"). Six days later, EPA met with a consortium of public interest groups, including plaintiffs HEAL, Safe Cement Alliance of Texas, Desert Citizens Against Pollution, Adans for A Clean Environment ("Adans"), and the Lone Star chapter of the Sierra Club to discuss CKD waste.

Then followed a series of meetings in quick succession regarding CKD waste. On April 19, 1995, EPA met with two hazardous waste management industry organizations; a week later, EPA met with a group of state regulatory authorities; on May 2, 1995, EPA met with plaintiff Environmental Technology Council ("ETC"); and on May 9, 1995, EPA met again with ARTT. On June 2, 1995, EPA again met with APCA, which represented CKRC at this and future meetings, to discuss EPA's prior list of technical questions and issues concerning the proposed enforceable agreement. Responding to those concerns, APCA presented EPA with a revised section of the draft enforceable agreement concerning CKD management practices, and a new section allowing for public participation in implementing and enforcing the agreement. EPA forwarded copies of these sections to interested local citizen groups.

On August 13, 1995, APCA submitted to EPA a second revision of the CKD management practices of its proposed enforceable agreement. EPA then met with APCA on August 22, 1995, to discuss technical issues identified by EPA and other interested parties. At that meeting, EPA identified technical issues regarding the proposed enforceable agreement and draft CKD management practices; EPA also discussed the status of its consideration of legal and enforcement issues. EPA and APCA agreed to set up another meeting to discuss the engineering characteristics of CKD.

On that same date, EPA also sent a letter to interested public interest groups, including plaintiffs HEAL and Adans, inviting them to a meeting on September 12, 1995, and enclosing a copy of the industry's second revision to the CKD management practices section.

*See* August 22, 1995 letter from William Schoenborn, Waste Management Division, EPA, to Public Interest Group Representatives, attached to Complaint as Exhibit D. EPA stated in the letter that it "would particularly like to receive written alternative proposals for language and conditions for the enforceable agreement document," and requested that such proposals be submitted by the September 12 meeting "so [EPA could] discuss them with [the representatives of the various public interest groups]." In response, EPA received comments and proposals for technical standards from the public interest groups.

Plaintiffs HEAL and Adans were among the groups which attended the September 12 meeting. They presented to EPA an alternative proposal for public participation in the enforceable agreement, which EPA forwarded to the other interested parties for comment.

On September 19, 1995, plaintiff ETC contacted EPA staff to inquire about the availability of documents related to the proposed CKD enforceable agreement. ETC was informed that documents were available for review in the public docket, but that the docket needed to be updated. EPA staff subsequently added to the docket meeting notes, press releases, and letters and other correspondence related to the proposed CKD enforceable agreement.

On September 21, 1995, EPA met with APCA to exchange technical information regarding the engineering characteristics of CKD. On October 19, 1995, EPA conducted a conference call with state regulatory officials to update them on the status of the proposed enforceable agreement and to discuss unresolved technical, enforcement, and legal issues related to the proposed agreement. On November 6, 1995, EPA met with APCA to discuss its proposed legislative amendment to clarify EPA's legal authority to enter into the proposed enforceable agreement. In a conference call with APCA on November 21, EPA explained the statutory authority on which it might rely if it were to proceed with an enforceable agreement.

EPA is actively considering APCA's and CKRC's proposed enforceable agreement for CKD waste, but has not yet decided whether to pursue that approach. If EPA decides to pursue an enforceable agreement, it intends to use the information and comments already gathered to craft a draft agreement for distribution to all interested parties, including the plaintiffs, for their review and comment. These parties would include the cement industry, public interest groups, members of the hazardous waste treatment industry, and state regulatory officials. Following review of their comments, EPA intends to publish a notice in the Federal Register seeking further comments on all aspects of the draft agreement. Upon review of those comments, EPA intends to make a final decision on whether and how to proceed in developing an enforceable agreement.

Claiming that they have been excluded from the defendant's closed-door negotiations with the movants regarding the scope and stringency of CKD regulatory standards, the plaintiffs—a coalition of environmental groups—maintain that the defendant is utilizing the cement industry groups as an "advisory committee" within the meaning of the Federal Advisory Committee Act and that it has failed to comply with the Act's various procedural requirements. The plaintiffs seek to enjoin the defendant from conducting further meetings and from using any of the advice or recommendations obtained from the industry representatives in violation of the Federal Advisory Committee Act.

## DISCUSSION

■ Enacted to address problems created by the "numerous committees, boards, commissions, councils, and similar groups which

have been established to advise officers and agencies in the Executive Branch," 5 U.S.C.App. § 2(a) (1988), the FACA has two principal purposes: "to enhance the public accountability of advisory committees ... and to reduce wasteful expenditures on them." *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 459, 109 S.Ct. 2558, 2569, 105 L.Ed.2d 377 (1989). The FACA thus aims to " 'control the advisory committee process and to open to public scrutiny the manner in which government agencies obtain advice from private individuals and groups.' " *Washington Legal Found. v. American Bar Ass'n*, 648 F.Supp. 1353, 1358 (D.D.C.1986) (quoting *Lordship Indus., Inc. v. Committee for Purchase for the Blind*, 615 F.Supp. 970, 978 (E.D.Va.1985)).

■ Not all advisory bodies are caught up in the FACA's statutory scheme, however. Rather, the Act applies only to "Federal Advisory Committees," which are defined as:

any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof ... which is—

(A) established by statute or reorganization plan, or

(B) established or utilized by the President, or

(C) established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government....

5 U.S.C.App. § 3(2).[5] The parties agree that the dispositive issue in determining whether the cement industry representatives constitute a Federal Advisory Committee is whether the defendant is utilizing them "in the

5. If a body constitutes a "Federal Advisory Committee" under the FACA, it must conform its conduct to a number of stringent procedural requirements. These requirements include:
(1) publishing meeting notices in the Federal Register in advance, 5 U.S.C.App. § 10(a)(2) & 41 C.F.R. § 101–6.1015(b);
(2) permitting interested persons to attend meetings, 5 U.S.C.App. § 10(a)(3) & 41 C.F.R. § 101–6.1021;
(3) making complete records and full meeting handouts publicly available, 5 U.S.C.App. § 10(b);

(4) establishing the Advisory Body pursuant to specific authorizing requirements, *id.* § 9(a); and
(5) filing an adequate charter, *id.* & 41 C.F.R. § 101–6.1013.
While the defendant has encouraged public involvement with respect to its CKD regulatory determination, both parties agree that EPA has not complied with the FACA's procedural melange regarding its respective meetings with both cement industry representatives and the plaintiffs.

interest of obtaining advice or recommendations" for itself.[6]

## A. The defendant is not "utilizing" the working group of industry representatives within the meaning of the FACA because the industry group is not under the actual management or control of the defendant.

■ As noted, " 'utilized' encompasses a group organized by a nongovernmental entity but nonetheless so 'closely tied' to an agency as to be amendable to 'strict management by agency officials.' " *Food Chemical News*, 900 F.2d at 332–33 (internal citations omitted). Specifically, the plaintiffs claim that the industry representatives are utilized by the defendant because EPA has determined the schedule and made other logistical arrangements for the meetings with them, provided the meeting rooms, and spent public funds to retain a consultant, ICF Incorporated, to attend and assist with the meetings. The plaintiffs argue that the defendant exercises strict management over the industry representatives and that it is thereby using them as a preferred source of advice and recommendations in violation of the FACA.

The plaintiffs have failed to show that the defendant exercises the level of influence necessary to establish that the EPA utilizes or controls the independent, ad hoc assemblage of industry group representatives. Nothing in this case suggests that the working group is subject to actual management or control by the EPA, or that the industry representatives are so closely tied to the executive branch of the government as to render it a functionary thereof. Consequently, because the working group of industry representatives was not established or utilized by an agency of the executive branch within the meaning of the FACA, it not

subject to the FACA's meeting and record requirements.

In *Public Citizen*, the Supreme Court held that the FACA did not apply to the American Bar Association's Standing Committee on the Federal Judiciary, notwithstanding that the Department of Justice regularly sought advice from it concerning potential nominees for federal judgeships. With regard to "the almost unfettered breadth of a dictionary reading of FACA's definition of 'advisory committee' " 491 U.S. at 452 n. 8, 109 S.Ct. at 2566 n. 8, the Court observed

> There is no doubt that the Executive makes use of the ABA Committee, and thus "utilizes" it in one common sense of the term. As the District Court recognized, however, 'reliance on the plain language of FACA alone is not entirely satisfactory.' "Utilize" is a woolly verb, its contours left undefined by the statute itself. Read unqualifiedly, it would extend FACA's requirements to any group of two or more persons, or at least any formal organization, from which the President or an Executive agency seeks advice. We are convinced that Congress did not intend that result. A nodding acquaintance with FACA's purposes, as manifested by its legislative history and as recited in § 2 of the Act, reveals that it cannot have been Congress' intention, for example, to require the filing of a charter, the presence of a controlling federal official, and detailed minutes any time the President seeks the views of the National Association for the Advancement of Colored People (NAACP) before nominating Commissioners to the Equal Employment Opportunity Commission, or asks the leaders of an American Legion Post he is visiting for the organization's opinion on some aspect of military policy.

---

**6.** The coordination of the terms "established" and "utilized" with "or" implies that the terms are exclusive, i.e., that only one of these possibilities can be realized in any given instance. Thus, within the meaning of the FACA, a federal advisory committee can either be established by an agency or utilized by an agency—but not both. This is consistent with the Supreme Court's delineation of the terms in *Public Citizen* whereunder " 'established' indicates 'a Government-

formed advisory committee,' while 'utilized' encompasses a group organized by a nongovernmental entity but nonetheless so 'closely tied' to an agency as to be amendable to 'strict management by agency officials.' " *Food Chemical News v. Young*, 900 F.2d 328, 332–33 (D.C.Cir.1990) (internal citations omitted), *cert. denied sub nom Food Chemical News v. Benson*, 498 U.S. 846, 111 S.Ct. 132, 112 L.Ed.2d 99 (1990).

*Id.* at 452–53, 109 S.Ct. at 2566 (internal citations and footnotes omitted).

After examining the FACA's legislative history, the Court concluded that the phrase "or utilized" was added to FACA's definition of an advisory committee "simply to clarify that FACA applies to advisory committees *established* by the Federal Government in a generous sense of that term...." *Id.* at 462, 109 S.Ct. at 2571 (emphasis added). The Court therefore rejected the argument that an agency "utilizes" a committee within the meaning of the FACA if it "makes use of" the committee's work product. Instead the Court looked to whether the committee had been formed "at the Federal Government's prompting" and was amenable to strict management by agency officials." *Id.* at 457–58, 109 S.Ct. at 2568.

A similar conclusion was reached in *Washington Legal Found. v. United States Sentencing Comm'n,* 17 F.3d 1446 (D.C.Cir.1994) when a plaintiff sought access under the FACA to the deliberations and documents of a committee advising the Sentencing Commission, an independent agency within the Judicial Branch. The Advisory Group included two Department of Justice employees who "played an important role" in the Group's work, *id.* at 1450, and, as the Court noted, the Justice Department, "which [was to] enforce these new Guidelines, [had] every reason to be interested, and to participate, in the Advisory Group's deliberations," *id.* at 1451.

Notwithstanding the Justice Department's active participation in and inevitable use of the Advisory Group's deliberations and work product, the Court of Appeals flatly rejected the argument that the Justice Department "utilized" the Group within the meaning of the FACA. The Court explained that, in order to demonstrate that an agency has "utilized" a committee, a plaintiff must demonstrate that the agency had "actual management or control of the advisory committee." *Id.* at 1450. This, the Court noted, is a "stringent standard, denoting something along the lines of actual management or control of the advisory committee." *Id.* Merely demonstrating influence over a committee's affairs is insufficient, because "influence is

not control." *Id.* at 1451. *See also Sofamor Danek Group, Inc. v. Gaus,* 61 F.3d 929, 936 (D.C.Cir.1995); *Food Chemical News,* 900 F.2d at 333.

*Public Citizen* and *Washington Legal Foundation* thus rejected the very claim that the plaintiffs are advancing here: that the FACA is triggered by an agency's mere use of a private group to obtain advice. Not only do the undisputed facts demonstrate that the industry group is not so closely tied to the defendant as to be amenable to strict management by EPA officials and that the group is therefore not being utilized by the defendant within the meaning of the FACA, but the group is so amorphous that it can hardly be called a "committee" at all.

As a threshold matter, the defendant has not "used" the industry proposal for any purpose at all. EPA is actively considering the proposed enforceable agreement and has met with various interested parties—including the plaintiffs—regarding its contents. However, as of now, it has made no decision to actually pursue an enforceable agreement approach for regulating CKD waste, and in fact is exploring alternative regulatory approaches.

However, even if the defendant does ultimately "use" the proposed enforceable agreement, that does not transform the industry group into a federal advisory committee. First, the cement industry, not EPA, broached the issue of an "enforceable agreement" regarding the regulation of CKD. Cement industry officials wrote draft CKD management practices, forwarded a draft enforceable agreement to EPA, and then requested a meeting with EPA to discuss management practices and the concept of an agreement. Thus, it cannot be said that the group was "established" at the prompting of the defendant. In short, there is no "Government-formed advisory committee" here. *Food Chemical News,* 900 F.2d at 332–33.

Moreover, the lack of EPA management or control over subsequent meetings and the cement industry's efforts to draft an enforceable agreement, indicates that the ad hoc cement industry group was not "utilized" by EPA. Logistical control over the meetings does not translate into substantive control

over the industry group. Nor does the fact that the defendant informed the group of the various issues that would have to be addressed in any proposed enforceable agreement before it would be considered. *See Consumers Union of the United States, Inc. v. HEW*, 409 F.Supp. 473, 476–77 (D.D.C. 1976) (FACA did not apply to agency-industry meetings concerning industry group's own proposal for a nonregulatory cosmetic testing program), *aff'd*, 551 F.2d 466 (D.C.Cir.1977). EPA merely informed the group of technical, legal, and enforcement issues that any enforceable agreement would need to address before it could be implemented. This and the administrative arrangements undertaken by EPA with regard to its meetings with the industry groups stops short of anything close to utilization, i.e., actual management or control of the group.

Furthermore, as the Court of Appeals recently observed, "[i]n order to implicate the FACA, the President, or his subordinates, must create an advisory group that has, in large measure, an organized structure, a fixed membership and a specific purpose." *Association of American Physicians and Surgeons v. Clinton*, 997 F.2d 898, 914 (D.C.Cir.1993). The industry group has neither a fixed membership, in terms of the industry representatives who attended the various meetings with EPA officials, nor and an organized structure. Rather, the so-called "industry group" amounts to little more than two private trade associations with no specific purpose other than to represent the broad interests of their members. In sum, the "industry group" simply does not have the requisite formality and structure of an advisory committee. Accordingly, because the industry group was not established nor is it utilized within the meaning of the FACA, and because it lacks the structure of an advisory committee, the Court shall grant the defendant's Motion for Summary Judgment.

7. As the Court of Appeals has noted, the "interest" test under Rule 24(a)(2) "is primarily a practical guide to disposing of lawsuits by involving as many *apparently* concerned persons as is

**B. The APCA and CKRC are entitled to intervene because they have an interest in the outcome of the instant litigation which is not adequately represented by the defendant.**

■ Federal Rule of Civil Procedure 24(a) allows for intervention as of right in two situations:

(1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's interest is adequately represented by existing parties.

FED.R.CIV.P. 24(a). The first subsection is inapplicable as the FACA does not provide a right to intervene and the movants do not identify any other statute conferring upon them a right of intervention. However, because the movants have demonstrated that the outcome of this case threatens to impair or impede its ability to protect its legitimate interests, they are entitled to intervention as of right under subsection 2.[7]

Were the plaintiffs to prevail on the merits of this case and obtain the relief they seek, the defendant would be enjoined from relying in any way on the product of its meetings with various industry representatives. In addition to thwarting otherwise useful interaction between government and nongovernmental groups, this would have the result of rendering useless not only the efforts of the defendant, but the substantial good faith efforts of the cement industry to develop the enforceable agreement and the proposed CKD management practices that are the subject of the plaintiffs' Complaint. As the movants note, their position with respect to the underlying regulatory issues does not mirror that of the defendant. Moreover, the movants and the defendant are not similarly situated with respect to the FACA question in this case; it is the movants who not only

compatible with efficiency and due process." *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C.Cir. 1967) (emphasis added).

initiated but have borne the primary expense associated with the development of the proposed enforceable agreement.

Because any injunctive relief would likely eviscerate their substantial work product, and because it would establish a rule of law unfavorable to them, the Court concludes that the movants are entitled to intervene. *Natural Resources Defense Council v. Environmental Protection Agency,* 99 F.R.D. 607, 609 (D.D.C.1983) (industry groups entitled to intervene under Rule 24(a)(2) in FACA case where their efforts over a protracted period of time could be "nullified" if the relief the plaintiffs sought were granted).

█ Alternatively, even if intervention as of right were not warranted, permissive intervention would be. Federal Rule of Civil Procedure 24(b) provides for intervention in two situations:

(1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.

FED.R.CIV.P. 24(b). Permissive intervention lies within the discretion of the Court and "in exercising its discretion the Court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.* The Court concludes that the movants are entitled to permissive intervention.

The movants' defenses to the plaintiffs' claims have both questions of law and fact in common with the main action, i.e., whether the defendant's meetings with the movants violated the FACA. Furthermore, because the Court concludes that their intervention would not unduly delay the adjudication of the rights of the original parties, the Court concludes that the movants are entitled to permissive intervention, as well as intervention as of right under Rule 24(a), as previously indicated.

## CONCLUSION

Upon careful consideration of the parties' and the movants' pleadings, the entire record herein, and the law applicable thereto, the Court shall enter an Order of even date herewith consistent with the foregoing Memorandum Opinion granting the defendant's Motion for Summary Judgment, denying the plaintiffs' Motion for Summary Judgment, and granting the movants' Motion to Intervene.