The SEMINOLE NATION OF
OKLAHOMA, Plaintiff,

v.

Gale NORTON, et al., Defendants.

Civ.A. No. 00–2384(CKK).

United States District Court,
District of Columbia.

Sept. 27, 2001.

Marcella Burgess Giles, McLean, VA, Ernest Cornish Baynard, III, Washington, DC, for plaintiff.

Anthony Rogers, U.S. Department of Justice, General Litigation Division, Washington, DC, for defendant.

Franklin B. Velie and Mark H. Goldey, Salans Hertzfeld Heilbronn Christy & Viener, New York, NY, for intervenor.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

This case comes before the Court on a motion to intervene filed by the Dosar–Barkus Band of the Seminole Nation. At present, the above-captioned lawsuit is an action by Plaintiff Seminole Nation of Oklahoma (the "Seminole Nation" or the "Nation") for Declaratory and Injunctive relief. At the center of Plaintiff's Complaint is an attempt by the Seminole Nation to amend the Seminole Constitution and Defendants'[1] refusal to recognize those amendments. Proposed intervenors, the Dosar–Barkus and Bruner Bands of the Seminole Nation (the "Freedmen" or "Proposed–Intervenors"), assert that one of the constitutional amendments which gives rise to the dispute between Plaintiff and Defendants threatens to adversely affect their rights. As a result, the Freedmen assert that they should be permitted to intervene in this suit as Plaintiff–Intervenor. Plaintiff opposes this intervention. Defendants do not oppose the intervention to the extent that Proposed–Intervenors do not seek to expand the scope of the present suit. However, Defendants oppose Proposed–Intervenors' attempts to expand the scope of the instant litigation. Having considered the Freedmen's motion to intervene, Plaintiff's opposition, Defendants' partial opposition, the Freedmen's reply, and the Freedmen's supplemental response, the Court concludes that the Freedmen's motion to intervene should be denied.

## I. BACKGROUND

### A. Background to Plaintiff's Complaint

The Seminole Nation is a federally recognized Indian tribe. Am.Compl. ¶ 1. The Nation is located within the boundaries of Seminole County, Oklahoma. *Id.* ¶ 1. The Seminole Constitution was approved by the Nation's voters on March 8, 1969. *Id.* ¶ 10. The Nation opted not to organize under the Oklahoma Indian Welfare Act ("OIWA"), 25

U.S.C. § 503, and, like other Oklahoma tribes, was excluded from coverage of the Indian Reorganization Act ("IRA"), 25 U.S.C. § 476. *Id.* ¶ 10.

The Seminole Constitution originally included a provision in Article XIII which stated that all constitutional amendments are subject to approval by the Secretary of the Department of Interior ("DOI"). The Seminole Nation amended its constitution in 1989 and 1991. *Id.* at ¶ 10. The 1991 amendments purported to eliminate the Article XIII provision requiring approval from the Secretary of all constitutional amendments. *Id.* ¶ 11. Ironically, the Nation did not complete the amendment process by obtaining approval from the Secretary for this amendment. The Commissioner of the Bureau of Indian Affairs ("BIA"), acting on behalf of the Secretary, *sua sponte* declined to approve the 1991 amendment to Article XIII. *Id.* ¶ 11. An appeal from this disapproval was taken to the Interior Board of Indian Appeals ("IBIA") which held that the Secretary has broad discretion to decide whether to approve an amendment to the Seminole Constitution which removes the Secretarial approval provision. *Id.* ¶ 11; *Seminole Nation of Oklahoma v. Acting Director, Office of Trial Service, Bureau of Indian Affairs,* 24 IBIA 209, 223 (1993). Thus, the Board affirmed the BIA's decision. Amend.Comp. ¶ 11. The Board also held that federal statute requires the Secretary to approve amendments to the Seminole Constitution which concern selection of the Principal Chief. 24 IBIA at 222.

On July 1, 2000, the Seminole Nation again purported to amend its Constitution. Amend.Compl. ¶ 15. In a letter dated July 29, 2000, the Regional Director of the BIA advised the Nation that he would not approve the latest amendments because the Nation had not followed the procedure outlined for OIWA tribes. *Id.* ¶ 16. The Nation appealed the letter to the IBIA, which held in response that the July 29, 2000, letter was null and void.[2] *Id.* ¶ 17. Plaintiff alleges

1. Plaintiff has named as Defendants in this action the Secretary of the Department of the Interior and the Assistant Secretary of the Department of the Interior. Both of these individuals

are sued in their official capacity as representatives of the Department of the Interior.

2. The grounds for the victorious appeal appear to have been that the Nation had not elected to

that on August 14, 2000, BIA officials verbally informed the Nation that "the payments that would normally be paid to the Tribe the following day would probably not be paid." *Id.* ¶ 18. The Nation was allegedly informed further that this action would be taken because the Nation had failed to submit the recent constitutional amendments to the BIA for approval. *Id.* ¶ 18.

On August 30, 2000, the Nation received a letter from the Assistant Secretary for Indian Affairs at the DOI. *Id.* ¶ 21. This letter reiterated the statement in the BIA's July 29, 2000, letter that the recent amendments to the Seminole Constitution had not yet been submitted for approval. *Id.* ¶ 21. The letter provided in conclusion:

> The purpose of this letter is to request that the July 1, 2000, revisions be submitted to the Eastern Oklahoma Regional Office, within 20 days of the date of this letter, for review and recommendations to this office. Should this request not be met, the Department of the Interior will have no choice but to disapprove all of the proposed revisions ...

Viewing the DOI's action as a threat to the "health, welfare and safety" of the Nation, the Attorney General of the Seminole Nation prepared to file suit in U.S. District Court to enjoin the actions of the DOI. *Id.* ¶¶ 25–28.

Prior to the filing of suit, the Nation and the DOI worked out an agreement whereby the DOI would issue a "final decision" and the DOI would delay taking the action described in the August 30, 2000, letter. The DOI issued its final decision in a letter dated September 29, 2000. *Id.* ¶ 31. The letter recounts the DOI's "request that the Seminole Nation of Oklahoma submit nine recently proposed constitutional revisions to the Bureau of Indian Affairs in accordance with Article XIII, section 1 of the Seminole Constitution." Amend.Compl., Ex. 1. The letter expresses particular concern "about the revisions that purport to disenfranchise the Freedmen members of the Seminole Nation." *Id.* The letter states that, as a result of the Nation's failure to submit the constitutional revisions, the action taken to remove the Freedmen from membership is deemed "disorganize under the OIWA. Amend.Compl ¶ 16.

approved and invalid" and without "force and effect." *Id.* The letter goes on to reject all of the proposed amendments to the Seminole Constitution. *Id.* Finally, the letter advises that "for purposes of carrying out the government-to-government relationship between the United States and the Seminole Nation of Oklahoma, [the DOI] will not recognize any further resolutions or actions of the General Council without the participation of the Freedmen." *Id.* It is this final agency action, as memorialized in the DOI's September 29, 2000, letter from which the Seminole Nation seeks relief. Accordingly, on October 3, 2000, the Seminole Nation filed suit against the DOI seeking judicial review of the DOI's refusal to recognize the recent constitutional amendments.

### B. The Freedmen

The Freedmen, also known by their Seminole name, "Estelusti," constitute a significant portion of the Seminole Nation. As referenced in the September 29, 2000, letter, one of the proposed amendments to the Seminole Constitution is the removal of the Freedmen from membership in the Seminole Nation of Oklahoma. The history of the Freedmen, as recently recounted by the U.S. Court of Appeals for the Tenth Circuit, is as follows:

> Some members of the Seminole Nation are descended from escaped African slaves who resided among several Native American groups living in what is now Florida. These Native American groups, together with the Africans living among them, became known as the Seminoles. The Africans were referred to in the Seminole tongue as "Estelusti."

> In 1906, the Dawes Commission, acting pursuant to Congressional authority, created two authoritative membership rolls for the Seminole Nation (the "Dawes Rolls"). The Estelusti Seminoles were enrolled on what is sometimes referred to as the "Freedmen Roll." Non–Estelusti Seminoles were enrolled on the "Seminole Blood Roll." Because the Seminole Nation is matrilineal, if an individual's mother was

a Freedman and his father was Indian by blood, that individual was enrolled in the Freedmen Roll. The Dawes Rolls are still used today to determine the members of the Seminole Nation. Anyone who can trace his or her ancestry to the Dawes Rolls is deemed to be a member of the Seminole Nation. Each member of the Dosar Barkus and Bruner Bands is a member of the Seminole Nation, and those Bands are made up exclusively of individuals descended from persons enrolled on the Freedmen Roll.

Notwithstanding the separate classification of the Estelusti Seminoles by the Dawes Commission, a treaty entered into by the United States and the Seminole Nation in 1866 (the "1866 Treaty"), and in effect at the time the Dawes Rolls were created, contains the following provision:

> [I]nasmuch as there are among the Seminoles many persons of African descent and blood, who have no interest or property in the soil, and no recognized civil rights, it is stipulated that hereafter these persons and their descendants, and such other of the same race as shall be permitted by said nation to settle there, shall have and enjoy all the rights of native citizens, and the laws of said nation shall be equally binding upon all persons of whatever race or color, who may be adopted as citizens or members of said tribe.

*Treaty With the Seminole,* Mar. 21, 1866, U.S.–Seminole Nat., 14 Stat. 755, 1866 WL 4729, at *2.

*Davis v. United States,* 192 F.3d 951, 954–55 (10th Cir.1999). Having been a recognized part of the Tribe since 1866, the membership of the Freedmen in the Seminole Nation is now threatened by the Nation's recent attempt to amend its ' Constitution. The Freedmen's motivation for intervening in this suit is, in part, to protect their right to citizenship in the Seminole Nation.

## II. DISCUSSION

Pending before the Court is the Freedmen's motion to intervene in the instant action. The Freedmen assert that they may intervene as of right because the proposed constitutional amendment which lies at the heart of Plaintiff's Complaint threatens to impair the Freedmen's rights as citizens of the Seminole Nation. In addition, the Freedmen assert that their intervention is necessary in order to protect their "right to share in communal Tribal property." Freedmen Mem. in Supp. of Intervention (Freedmen Mem.) at 1. It is this second assertion which gives the Court significant pause.

This seemingly innocuous reference to "communal Tribal property" is, in fact, an attempt by the Freedmen to broaden the scope of the lawsuit currently before the Court. Specifically, the "communal Tribal property" about which the Freedmen are most concerned is a judgment fund awarded to the Seminole Nation and other Native American groups from the United States government totaling 56 million dollars ("Judgment Fund Award"). *See Davis,* 192 F.3d at 955. The Judgment Fund Award arises out of a series of separate claims filed in 1950 and 1951 by the Seminole Nation and the Seminoles still residing in Florida. *Id.* These groups filed separate claims with the Indian Claims Commission seeking compensation for tribal lands in Florida ceded to the United States in 1823. *Id.* Twenty-six years after the claims were filed, the Indian Claims Commission ruled in favor of the Seminoles and awarded a $16 million judgment to "the Seminole Nation as it existed in Florida on September 18, 1823." *Id.* (internal quotes omitted).

In 1990, Congress passed an Act (the "Distribution Act") setting forth criteria for the use and distribution of the Judgment Fund Award. *See Indian Claims: Distribution of Funds to Seminole Indians,* Pub.L. No. 101–277, 104 Stat. 143 (1990). The procedure established by the Seminole Nation for participating in a Judgment Fund Award Program requires that the individual seeking to participate present a "Certificate of Degree of Indian Blood" ("CDIB"). *Davis,* 192 F.3d at 956. CDIBs are issued by the BIA. *Id.*

In *Davis v. United States,* a case pending before Judge Vicki Miles–LaGrange in United States District Court for the Western District of Oklahoma, the Freedmen have claimed that the Seminole Nation's imple-

mentation of the Distribution Act violates one of the Act's provisions by establishing a procedure which effectively excludes the Freedmen from benefitting from programs funded by the Judgment Fund Award. *Id.* The plaintiffs in *Davis* filed suit against the BIA alleging that the BIA has violated its own policy by refusing to issue CDIBs to the Freedmen. *Id.* Initially, the district court in *Davis* dismissed the Freedmen's claims against the BIA for failure to join the Seminole Nation, who, because of sovereign immunity, could not be made a party. *Id.* at 956–57. The United States Court of Appeals for the Tenth Circuit reversed and remanded the case to the district court for a determination as to whether the Seminole Nation is merely a "necessary party" pursuant to Federal Rule of Civil Procedure 19(a) or whether the Nation is an "indispensable party" pursuant to Federal Rule of Civil Procedure 19(b). *Id.* The determination of the *Davis* district court on this issue is still pending.

*A. Scope of Intervention*

■ Proposed intervenors urge the Court to expand the scope of the instant suit to address, *inter alia*, the same issues as those which are currently being litigated in the *Davis* suit. In this regard, the Freedmen have framed their interest in the present action as a right to "participate in Judgment Fund benefits and/or obtain a share of the Judgment Fund." Freedmen Mem. at 23. As explained in detail below, the Court rejects this view of the Freedmen's interest in the present case. Indeed, an examination of the Freedmen's proposed complaint reveals the overly broad scope of the Freedmen's contemplated intervention.

The Freedmen propose to file an ambitious and wide-ranging ten-count complaint as Plaintiff–Intervenors against both the federal government and the Seminole Nation. Counts one and two assert violations of federal law and the Seminole Constitution against the Seminole Nation. Counts three, four, and six seek review of agency action taken by the Department of the Interior. Counts five and seven allege violations of the equal protection clause by the federal government. Counts eight and nine, seeking

relief from all Defendants, allege breach of trust and request partition of the Judgment Fund Trust, respectively. Count ten alleges waste and surcharge against the federal Defendants.

■ In contrast to the issues raised in the Freedmen's proposed complaint, the sole issue presented to the Court by the Seminole Nation concerns the role of the BIA in the process of amending the Seminole Constitution. The only link between that issue and the ones advanced by the Freedmen is that three of the proposed amendments to the Seminole Constitution concern the Freedmen's status in the tribe. The single claim brought by Seminole Nation does not call upon this Court to consider the impact of the proposed constitutional amendments upon the Freedmen. Quite to the contrary, the only issue presented for this Court's consideration, pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.*, is the reasonableness of the Department of the Interior's determination not to recognize the recent amendments to the Seminole Nation's Constitution, some of which purport to remove the Freedmen from the tribe. *See* Amend.Compl. ¶¶ 54–56. It has long been established that the Court's review in APA actions is confined to the administrative record. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *American Bioscience, Inc. v. Thompson,* 243 F.3d 579, 582 (D.C.Cir.2001). The DOI decision presented for review by this Court, though it impacts upon the Freedmen's rights to membership in the Seminole Nation, does not directly address the merits of the Freedmen's entitlement to such membership, nor does it address the wisdom of the Seminole Nation in attempting to remove the Freedmen from the Nation. *See* Am.Compl., Ex. 1; Admin.R., Doc. 20. Rather, the DOI's disapproval appears to be primarily concerned with whether the recent amendments were provided to the DOI for approval and whether the amendments pertaining to the Freedmen conflict with existing statute and treaty. *See id.* Thus, substantially all of the issues raised by the Freedmen fall far outside of the scope of the APA issue brought before

the Court in the Seminole Nation's Complaint.

It is noteworthy that Proposed–Intervenors have aligned themselves on the Plaintiff-side of the present dispute. The Court does not see the basis for this alignment. Plaintiff has taken the position that it may amend the Seminole Constitution to remove the Freedmen from the Tribe and that the DOI is without authority to disapprove such action. This position, as Proposed–Intervenors themselves concede "is entirely adverse to the Estelusti, of course." Freedmen Mem. at 24. In contrast, Defendants in this case have reached the conclusion that the acts of the Seminole Nation to remove the Freedmen from the tribe and any acts of the Seminole Nation's newly configured General Counsel following the removal of the Freedmen are illegitimate and will not be recognized by the United States government. The DOI's stance places the agency in a position which has the tangential effect of protecting the Freedmen's rights to citizenship in the Seminole Nation. Thus, there seems little if any basis for the Freedmen to intervene on the plaintiff's side of this APA suit. Indeed, the interests of the DOI and the Freedmen are only adverse with regard to issues which fall outside of the scope of this litigation, and indeed, have already been raised in the *Davis* litigation. In this light, it becomes apparent that it is not the present configuration of the suit which guides the Freedmen's attempt to intervene as Plaintiff, but rather, the Freedmen's vision of a broad expansion of the suit wherein they, as Plaintiff, may assert an entirely new universe of claims against both parties presently in litigation.

█ Of course, the Freedmen argue that the Court should expand the scope of this litigation to permit them to intervene and to present claims which fall outside of the Seminole Nation's APA claim. However, this request, whether aimed at intervention as of right pursuant to Rule 24(a) or permissive intervention under Rule 24(b), is riddled with problems. First, it is well settled in this circuit that "[a]n intervening party may join issue only on a matter that has been brought before the court by another party." *Illinois Bell Telephone Co. v. FCC*, 911 F.2d 776, 786

(D.C.Cir.1990) (citing *Vinson v. Washington Gas Light Co.*, 321 U.S. 489, 498, 64 S.Ct. 731, 88 L.Ed. 883 (1944)) ("an intervenor is admitted to the proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues"). In this case, as in *Illinois Bell*, "the [proposed]-intervenor's characterization of the [Plaintiff's] challenges operates at an amusingly high level of generality; if such easy manipulation were availing, an intervenor would not, in practice, be limited at all to the issues raised by a petitioner." *Id.*

The rationale behind the rule espoused in *Illinois Bell* and *Vinson* is the desire to prevent an intervenor from circumventing other rules of procedure by simply intervening in another's lawsuit and expanding the scope of the issues presented therein. *See id.* This impermissible circumvention is the admitted motive behind the Freedmen's proposed intervention. For example, the Freedmen assert that they must be permitted to intervene in the instant suit because they will be able to bring claims against the Seminole Nation in this suit which they could not bring in the *Davis* litigation: "The Seminole Nation has waived its sovereign immunity in this court—and nowhere else." Freedmen Mem. at 26. Despite this bold presumption, the Court is not so easily convinced that the Seminole Nation's filing of the instant lawsuit somehow opens the Nation to any and all additional claims which an intervening party wants to add. Not surprisingly, the Freedmen neglect to identify any legal basis for their presumption that the Seminole Nation would not be immune to their claims if those claims were added to the narrow action pending before this Court.

More troubling still, the Freedmen "stipulate" that "they would take appropriate steps to stay the *Davis* action or transfer it to this Court so as to avoid waste of judicial resources." Freedmen Mem. at 26 n. 7. This self-interested offer underscores the Freedmen's unabashed attempt to return the *Davis* action, which was initially brought in this district, but was later transferred to the Western District of Oklahoma, to the District of Columbia. The attempt to intervene, thus, is exposed for what it truly is, an attempt to

circumvent the problems plaguing the *Davis* action, and to remove it from the Oklahoma Court, who, in the acerbic opinion of the proposed intervenors "has invested relatively little time in this matter, as it's [sic] only decision was reversed for failure to perform the required factual analysis." *Id.* This Court will not permit the Freedmen to so transparently engage in impermissible "judge shopping." Accordingly, the Court will reject the Freedmen's ubiquitous and persistent attempts to expand the scope of this litigation and shall only address the Freedmen's motion to intervene in the narrow framework of the single APA claim currently before the Court.

### B. Rule 24 Intervention

■ Under Federal Rule of Civil Procedure 24(a)(2), a nonparty may apply to intervene in an action as of right. The Rule provides, in relevant part:

> Upon timely application anyone shall be permitted to intervene in an action ... when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by the existing parties.

Fed.R.Civ.P. 24(a)(2). This Circuit recognizes four requirements for intervention of right: (1) timeliness; (2) a cognizable interest; (3) impairment of that interest; and (4) lack of adequate representation by existing parties. *See Williams & Humbert, Ltd. v. W & H. Trade Marks, Ltd.*, 840 F.2d 72, 74 (D.C.Cir.1988); *see also Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C.Cir. 1986); *People for the Ethical Treatment of Animals, et al. v. Babbitt*, 151 F.R.D. 6, 7 (D.D.C.1993). The Court of Appeals has described the interest test under Rule 24(a)(2) as "primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C.Cir.1967); *see also Huron Environmental Activist League v. EPA*, 917 F.Supp. 34 (D.D.C.1996).

■ Addressing the first of the factors, in evaluating timeliness, courts are instructed to determine timeliness not only by evaluating the point to which the case has progressed, but by evaluating all of the circumstances of the case. *Dize v. Amalgamated Council of Greyhound Local Unions*, 684 F.Supp. 332, 338 (D.D.C.1988) (quoting *National Association for the Advancement of Colored People v. New York*, 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973)). Examining the totality of the circumstances in this case, there is little, if any, basis for dispute over the timeliness of the Freedmen's motion to intervene. The Freedmen filed their motion two and a half months after the Seminole Nation filed its original Complaint. At that point, the only progress in the action was the service of summons, an amendment of the Complaint as of right, and an answer to the Amended Complaint by Defendants. Based upon these facts, the Court can readily conclude that the Freedmen's motion to intervene was timely.

■ Addressing the second of the four factors, it appears that the Freedmen likely have some cognizable interest in the outcome of the instant litigation, even in its narrow framing, because the determination of whether the DOI may disapprove the proposed constitutional amendment expelling the Freedmen from the Seminole Nation will have an impact upon whether, in the government-to-government relationship between the Seminole Nation and the United States, the Freedmen are considered to be part of the Seminole Nation. *See Seminole Nation of Oklahoma*, 24 IBIA at 225 ("Unapproved tribal governing documents, while clearly entitled to respect, are not binding on Department [of the Interior] officials in the same sense [as approved constitutional documents] and would not necessarily preclude the BIA from looking behind the documents if necessary to carry out government-to-government relationship—in a case, for instance, where BIA determined that a constitutional provision was in violation of the Indian Civil Rights Act (ICRA).") (citation omitted). Thus, it appears that the Freedmen satisfy the second requirement for intervention, in that they possess a cognizable interest in the

instant litigation, in its narrowly tailored form.[3]

The third requirement for intervention demands an examination of whether the proposed-intervenor's interest in this litigation, as narrowly described above, will be impaired by a judgment issuing from this Court. Under the impairment prong, the significant difference between the framing of the issues by the Freedmen and by the Plaintiff and Defendants again comes to light. Because the action before the Court does not call upon the Court to address the right of the Freedmen to money in the Judgment Fund, nor to address the Freedmen's rights to any other money provided to the Seminole Nation, it is clear that these potential rights will not be impaired by the judgment of this Court. Notably, the Freedmen admit as much in their filings by asserting that the Court may fashion a remedy for the Freedmen's claimed harms even if the Seminole Nation is deemed to be immune from the Freedmen's claims. Freedmen Reply at 12. Specifically, the Freedmen contend that as a remedy for their claims, the Court could "order the BIA to apportion the Judgment Fund" or "order the BIA to grant CDIB cards to the Freedmen." *Id.* As is readily apparent, these examples provide relief for the claims asserted in the *Davis* suit, and *not* for the claims asserted in this suit. These forms of relief do not, in fact, bear any relation to the narrow issue of the Freedmen's membership in the Seminole Nation and the amendment to the Seminole Constitution which purports to alter that membership. As a result, there is no threat that this suit will impair the Freedmen's rights to tribal funds, for as the Freedmen themselves admit, if the Seminole Nation's recent constitutional amendments are recognized, the Freedmen may seek to partition the Judgment Fund. *See* Freedmen Mem. at 23 ("[I]f the Freedmen are no longer Seminole citizens, then their claims become a claim for partition of the Judgment Fund Trust."). Nonetheless, this conclusion does not foreclose the possibility that the Freedmen have some other protectable interest in the instant litigation.

■ Stripped of the Freedmen's attempts to broaden the suit, at present, the Freedmen's interest in the instant litigation concerns only the effect upon their rights of DOI approval or rejection of the constitutional amendment which excludes the Freedmen from the Seminole Nation. Despite this narrow framing, the Freedmen do possess some interest in the litigation. Certainly if the Court were to rule that the Department of the Interior had improperly rejected the recent amendments to the Seminole Constitution, such a ruling might impair the Freedmen's rights to representation in a government, i.e., the Seminole Nation, which is recognized and has a relationship with the United States government. Thus, even as the suit is narrowly framed, the Freedmen satisfy the third prong of the inquiry regarding intervention.

Finally, the fourth element to be considered when addressing a motion to intervene is whether the interests of the proposed intervenor are adequately represented by the parties already in the suit. Because the right at issue in the instant suit is the Estelusit's right to representation in the government of the Seminole Nation, vis á vis the government-to-government relationship between the Seminole Nation and the United States government, it would appear that the Freedmen's interests are aligned with those of Defendants as representatives of the Department of the Interior. Any adverse interests between the Department of the Interior

---

**3.** In addition to their interest in their citizenship rights as members of the Seminole Nation, the Freedmen frame their interests in this litigation as a financial one. This framing accords with the Freedmen's view that this suit concerns the Judgment Fund and will affect the Freedmen's rights to the money in the Judgment Fund. As stated above, the Court disagrees with this overly broad view of the issues presented to the Court. Again, the Court's review in this case is limited to the "final agency decision" memorialized in the September 29, 2000, letter from the BIA to the Chief of the Seminole Nation which speaks only in terms of approving or disapproving the amendment to the Seminole Constitution. Thus, contrary to the Freedmen's assertion that their interest in this litigation is akin to "a claim to property that is the subject matter of the suit," Freedmen Mem. at 22 (quoting *Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C.Cir.1981)), there is no identifiable "property," in this regard, which is the subject of this suit.

and the Freedmen fall outside of the scope of this litigation, and are more appropriately confined to the *Davis* litigation, which is still pending in the Western District of Oklahoma. Thus, the fourth inquiry, appropriately tailored, asks whether the Department of the Interior is an adequate representative of the Freedmen's interests in the present, narrowly framed action.

■ "The original burden of showing inadequate representation rests on the applicant for intervention." *Dimond*, 792 F.2d at 192. This burden is not "onerous" because the applicant "need only show that representation of his interest 'may be' inadequate." *Id.* Proposed–Intervenor's argument alleging inadequate representation posits that "the BIA is not concerned with the Freedmen citizenship per se, but merely with having what it perceives as the appropriate procedures followed with respect to the amendment of the Seminole Constitution." Freedmen Mem. at 24. As a result, argue the Freedmen, the BIA has not "raised substantive defenses to alienation or affirmative claims of any sort." *Id.* At first blush, these assertions are troubling and appear to justify intervention of the Freedmen. However, the leap to this conclusion neglects the very nature of the case currently before the Court.

■ Plaintiff's petition for relief presented in this action contains a single request for judicial review, pursuant to the APA, of the DOI's decision not to recognize the recent amendments to the Seminole Constitution and the subsequent acts of the Nation's General Counsel. Under the APA, federal courts are only empowered to review the conduct of federal agencies. *See Shultz v. SEC*, 614 F.2d 561, 568 (7th Cir.1980). Review pursuant to the APA "is to be based on the full administrative record that was before the Secretary at the time he made his decision." *Overton Park*, 401 U.S. at 420, 91 S.Ct. 814. The Court may not consider "post-hoc rationalizations" for agency conduct. *Id.* at 419, 91 S.Ct. 814. Likewise, the Court "may not substitute its judgment for that of the agency." *Id.* at 416, 91 S.Ct. 814. Given the APA's constraints, any new theories presented to this Court by the Freedmen which did not comprise the basis for the

DOI's decision necessarily fall outside of the scope of the administrative record, and thus, are improper for this Court's consideration. Notwithstanding the effect of the Department of the Interior's decision upon the Freedmen, the Freedmen cannot be permitted to present their "substantive defenses," which appear to fall outside the administrative record, however powerful, in the narrowly tailored action before the Court.

As this Court's review is constrained to the administrative record, the only potential for inadequacy in the representation of the DOI is the risk that the DOI will not vigorously defend itself against Plaintiff's APA claim. There is no indication in the record that any such risk exists. Absent the possibility of inadequate representation, the Freedmen are not entitled to intervention as of right pursuant to Rule 24(a) of the Federal Rules of Civil Procedure. Because there is no true likelihood that the DOI will inadequately defend its action, and thus, inadequately represent the Freedmen at this stage in the litigation, the Court concludes that the Freedmen are not entitled to intervene in the instant suit as it is narrowly framed. However, the Court shall consider the Freedmen's already-filed "Brief in Opposition to the Seminole Nation of Oklahoma's Motion for Summary Judgment and in Support of the Federal Defendants' Cross–Motion for Summary Judgment," to the extent that it raises arguments appropriate for the Court's consideration, as a filing of amicus curiae.

### III. CONCLUSION

■ Based on the foregoing, the Court shall deny the Freedmen's motion to intervene. Indeed, it is quite clear that the matters raised by the Freedmen far exceed the scope of the questions of law presently before the Court and such expansion is plainly impermissible. While the Court recognizes a potential interest of the Freedmen in the present litigation, in the narrow confines of the APA, the interests of the Freedmen are adequately represented by the Department of the Interior at this stage in the litigation. Thus, with regard to the present narrow framing of the claims in the litigation, the Freedmen cannot, at this stage in the litiga-

tion, be permitted to intervene as of right pursuant to Rule 24(a). The Freedmen fare no better in the context of permissive intervention as defined by Rule 24(b).[4] Certainly to permit intervention which so broadens the scope of litigation would delay the adjudication of the discrete issues presented to the Court by the original parties. Accordingly, the Court shall not permit the Freedmen to intervene pursuant to Rule 24(b), but shall consider the Freedman's brief as the filing of amicus curiae. An appropriate Order accompanies this Memorandum Opinion.

## ORDER

This case comes before the Court on a motion to intervene by the "Dosar–Barkus Band and the Bruner Band of the Seminole Nation of Oklahoma." For the reasons set forth in the accompanying Memorandum Opinion, it is this 27 day of September, 2001, hereby

**ORDERED** that the Motion to Intervene (# 5) is DENIED and it is further

**ORDERED** that Proposed Intervenor's Motion for an Order requiring service (# 23) is DENIED; and it is further

**ORDERED** that Proposed Intervenor's Motion for leave to file a Response (# 25–1) is DENIED.

**SO ORDERED.**

---

4. Federal Rule of Civil Procedure 24(b) provides: Upon timely application anyone may be permitted to intervene in an action ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties. Fed.R.Civ.P. 24(b).