The **SEMINOLE NATION OF OKLAHOMA, Plaintiff,**

v.

Gale **NORTON, Secretary, United States Department of the Interior, United States Department of the Interior, Defendants.**

No. Civ.A. 02–0730(RBW).

United States District Court, District of Columbia.

Sept. 23, 2002.

See also 206 F.R.D. 1.

Marcella Burgess Giles, McLean, VA, for plaintiff.

Caroline Meredith Blanco, United States Department of Justice, Environmental and Natural Resources, Washington, DC, for defendant.

Susan M. Williams, Corrales, New Mexico, for plaintiff-intervenor Jerry Haney.

### MEMORANDUM OPINION

WALTON, District Judge.

The current lawsuit is but one chapter in the ongoing saga between the plaintiff, the Seminole Nation of Oklahoma ("the Nation")[1] and the defendants, the Secretary of the United States Department of the Interior ("DOI" or "Department") and its

---

**1.** The Seminole Nation is a "[f]ederally recognized tribe" and constitutes one of the "so-called Five Civilized Tribes." Plaintiff's First

Amended Complaint for Declaratory and Injunctive Relief ("Compl.") ¶ 1. The Nation is "organized pursuant to its inherent sovereign

officials. Currently, plaintiff seeks a declaration from this Court that the DOI has acted in violation of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (2000) ("APA") and the "Principal Chief" Act of October 22, 1970, ("Act of 1970"), Pub.L. 91–495, 84 Stat. 1091, by refusing to recognize the plaintiff's General Council for the purpose of conducting government-to-government relations, and in continuing to recognize Jerry Haney, who has intervened in this matter, as the Nation's Chief. Before the Court at this time is the Plaintiff's Motion for Summary Judgment ("Pl.'s Mot."), the Defendants' Cross–Motion for Summary Judgment ("Defs' Mot.") and the pleadings in opposition to plaintiff's motion filed by plaintiff-intervenor Jerry Haney. For the reasons set forth below, both the plaintiff's motion for summary judgment and the defendants' cross-motion for summary judgment will be granted in part and denied in part.

## I. *Background*

The material events that precipitated the most recent controversy between the parties are as follows:[2] On July 1, 2000, the Nation held a referendum election in which it sought to adopt nine amendments to its Constitution. Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief ("Compl.") ¶ 7. Several of these proposed amendments were designed to exclude the Freedmen, who are Indians of partial African descent, from membership in the Nation. In a letter dated September 29, 2000, DOI Assistant Secretary Kevin Grover stated that he would not approve the nine amendments to the Seminole Constitution because they sought to exclude the Freedmen and had not been submitted to the DOI for approval. Compl. Exhibit ("Ex.") 4, Letter from Assistant Secretary–Indian Affairs to Chief Haney dated September 29, 2000; Administrative Record ("Admin.R.") Document ("Doc.") 9 at 20.

The Nation filed a lawsuit on October 3, 2000, "challenging the Department's authority to review and approve amendments to the Seminole Nation's Constitution" in this Court that was assigned to Judge Kollar–Kotelly. Pl.'s Mot., Statement of Facts not in Dispute ("Pl.'s Stmt.") ¶ 21.[3] However, while that action was pending the Nation held elections on July 14, 2001, that were conducted in compliance with the Constitutional amendments that had not been submitted to the DOI for approval and that the DOI therefore deemed to be disapproved. After a run-off election was held, Ken Chambers was elected Principal Chief and Mary Ann Emarthle was elected Assistant Chief of the Nation. Compl. ¶¶ 13, 15.[4] Although Freedmen

power and not under the auspices of the Oklahoma Welfare Act ... or the Indian Reorganization Act ..." *Id.*

2. The circumstances underlying some of the controversies that have existed between the parties and within the Nation itself have been outlined in several prior judicial opinions, and most recently in this Court's opinion that addressed the motions of the Dosar Barkus and Bruner Bands and Jerry Haney to intervene in this matter. *See Seminole Nation of Oklahoma v. Norton,* No. 02–0739 (D.D.C. July 3, 2002) (Walton, J.). *See also Seminole Nation of Oklahoma v. Norton,* 206 F.R.D. 1 (D.D.C. 2001) (Kollar–Kotelly, J.) (*"Seminole I "*); *Seminole Nation v. Norton,* 206 F.R.D. 1

(D.D.C.2001) (Kollar–Kotelly, J.) (opinion denying motion of Freedmen to intervene in *Seminole I* ); *Davis v. United States,* 192 F.3d 951 (10th Cir.1999) (action filed by Freedmen regarding entitlement to receive proceeds from the Nation's Judgment Funds).

3. Plaintiff's complaint states that the lawsuit was filed on October 11, 2000. Compl. ¶ 11. However, the docket sheet for that action confirms that the complaint was actually filed on October 3, 2000.

4. On June 23, 2001, prior to the election of Ken Chambers, the Nation's General Council passed Tribal Resolution No.2001–29, which, by a vote of 16 in favor, 8 opposed and 0

members did cast ballots, their votes were not counted in this election. *See* Plaintiff's Response to Defendant's Statement of Material Facts Not in Dispute ("Pl.'s Resp.") ¶ 20.

On September 27, 2001, Judge Kollar–Kotelly issued her ruling on the parties' cross motions for summary judgment. *Seminole Nation of Oklahoma v. Norton,* 206 F.R.D. 1 (D.D.C. 2001) (CKK) ("*Seminole I*"). Judge Kollar–Kotelly held that the DOI has authority, pursuant to Article XIII of the Seminole Constitution, to approve amendments to the Nation's Constitution before they could be adopted. *Id.* at 6. In addition, Judge Kollar–Kotelly held that "the DOI is independently authorized pursuant to the Act of 1970 to approve or disapprove amendments affecting the selection of the chief . . ." *Id.* Of the nine proposed amendments to the Nation's Constitution, the court held that the DOI properly disapproved the three amendments that sought to deny the Freedmen membership in the Nation, as the "DOI clearly express[ed] the basis for its objection to these amendments, pointing out that the Freedmen have been members of the Seminole Nation since 1866 and that their removal would violate both statute and treaty." *Id.* at 6. However, regarding the remaining six amendments, the court held that the DOI failed to express a

"rational objection to the substance of these amendments," *id.,* and therefore "did not act reasonably in rejecting the remaining proposed amendments to the Seminole Constitution on the sole grounds that the Seminole Nation failed to properly 'submit' those proposed amendments for DOI review." *Id.* at 6. Thus, the court remanded those six amendments back to the DOI for approval or rejection. *Id.*[5]

On October 10, 2001, Michael R. Smith, the Acting Regional Director of the Eastern Oklahoma Region of the Bureau of Indian Affairs ("BIA"), sent a letter to the Nation stating that the BIA's "refusal to recognize the results of the 2001 tribal elections is not unreasonable 'inasmuch as the Court affirmed the Department's positions regarding the Freedmen and the General Council' "; that the BIA would not restore a "government-to-government relationship" with the Nation's General Council "until the Freedmen representatives are restored to the General Council"; and that the BIA would continue to recognize Jerry Haney as Principal Chief and James Factor as Assistant Chief and required that the " 'General Council as it existed prior to August 10, 2000 be reinstated' with its first order of business 'to rescind General Council Resolution 2000–1051.' " Pl.'s Stmt. ¶ 25.[6] The Nation appealed the

---

abstaining, sought to remove Principal Chief Jerry Haney by suspension. Compl.Ex. 5, Seminole Nation of Oklahoma Tribal Resolution No.2001–29 dated June 23, 2001. However, pursuant to the Constitution of the Seminole Nation, Art. IX, § 1, the General Council may only remove an officer by "an affirmative vote of nineteen (19) members . . ." Thus, it appears that the 16 voters were Constitutionally inadequate to remove Chief Haney. And plaintiff has not proffered authority that authorizes suspension of the Principal Chief on a vote of less than 19.

5. The remaining six amendments did not affect the membership of the Freedmen in the Nation but dealt with, "*inter alia,* estab-

lish[ing] a court system charged with interpreting Seminole law, vest[ing] the Nation's government with the ability to lay and collect taxes, vest[ing] the tribe's members with the power to conduct referenda, and limit[ing] the term of the Principal Chief." *Seminole I,* at 6.

6. On October 11, 2001, the BIA sent a letter to its "sister federal agencies," advising them that Judge Kollar–Kotelly had issued her opinion and that the BIA would not restore government-to-government relations with the Nation until the General Council restored the Freedmen to tribal membership. Pl.'s Stmt. ¶ 29.

position advanced in this letter on October 23, 2001, pursuant to DOI regulations. *Id.* ¶ 26.

In response to the Nation's appeal, representatives of the Nation met with BIA employees of its Southern Plains Region for an "informal conference" on December 5, 2001. *Id.* ¶ 32. Thereafter, on December 27, 2001, the Southern Plains Region of the BIA issued its "Findings and Recommended Decision," which included a recommendation that the General Council recognize Jerry Haney as the Principal Chief. *See.* Pl.'s Mot., Ex. 5, Findings and Recommended Decision of the Informal Conference of December 27, 2001 for the Seminole Nation of Oklahoma. The Nation appealed the December 27 findings, but on January 28, 2002, the Interior Board of Indian Appeals ("IBIA") issued an order staying the appeal proceedings.[7] Pl.'s Stmt. ¶ 32.

While the foregoing events were in progress, "[o]n October 8, 2001, Freedmen representatives were hand delivered notices for a General Council meeting to be held on October 13, 2001." *Id.* ¶ 34. A proposed resolution, which would have the effect of recognizing full participation of the Freedmen on the Council, was included with the notice. *Id.;* Admin.R.Doc. 11. The General Council subsequently passed Tribal Resolution 2001–72 on October 13, 2001, which recognized "the Freedmen as fully participating on the General Council." *Id.* ¶ 38.[8]

Over the ensuing months, both the Nation and the Assistant Secretary of the

---

7. Plaintiff states that Mr. Smith's October 10, 2001, letter indicating that if the Freedmen were excluded from the at-large elections for Principal Chief and Assistant Chief, "that the Freedmen were also excluded from voting in each of the individual Bands' internal elections," is an incorrect statement that conflicts with "the Seminole Constitution as well as the customs of the Seminole Nation." Pl.'s Mot. at 26. Plaintiff maintains that the Freedmen have "never voted in the blood Bands internal political structures and neither have the blood Bands voted in the Freedmen's internal business. Mr. Smith's letter of October 10, 2001, is [characterized by plaintiff as] arbitrary at best or purposely capricious in order to financially strangle the Nation's remaining finances and further punish the tribe for not submitting amendments to the BIA for approval." *Id.* at 29. Plaintiff's argument about the Nation's Band elections not being conducted at-large is correct. And defendant acknowledges in its cross-motion for summary judgment that each Band of the Nation, of which there are fourteen, elects two representatives to serve on the Nation's General Council pursuant to Art. IV, sec. 1 of the Seminole Constitution. Def.'s Mot. at 3.

Plaintiff also appears to argue that because the appeal pertaining to the October 10, 2001, decision was stayed by the IBIA, the BIA's decisions not to recognize the results of the General Council elections are also stayed. Pl.'s Reply at 10 n. 4. However, the challenged actions here pertain to the defendants' September 29, 2000, letter, which predates the October 2001 letter. Therefore, it is not clear to the Court the relevance of the fact that the position stated in the October 10, 2001, letter was stayed, as the September 29, 2000, letter is final agency action being challenged by plaintiff and plaintiff provides no authority for the position that when a decision of the Acting Regional Director is stayed, this action would also serve to stay final decisions made by the Assistant Secretary.

8. On October 30, 2001, the Nation filed a motion for clarification of Judge Kollar–Kotelly's September 27, 2001 opinion, to determine "whether the . . . Opinion was a final judgment and if the application of the holding on the Freedmen amendments was retroactive and applicable to the General Election for the Principal Chief and Assistant Chief." Pl.'s Stmt. ¶ 42. Judge Kollar–Kotelly issued an order denying the motion on May 6, 2002. *Id.* The Nation then filed an appeal of Judge Kollar–Kotelly's decision on November 26, 2001. *Id.* ¶ 44. The District of Columbia Circuit dismissed the appeal, holding that it was not, in so far as several amendments had been remanded to the DOI, a final, appealable order. *See Seminole Nation v. Norton,* No. 01–5418, 2002 WL 1364249, at *1 (D.C.Cir. May 24, 2002).

BIA worked to resolve the issue regarding recognition of the General Council. *Id.* ¶ 53. On March 28, 2001, Assistant Secretary Neal A. McCaleb sent letters to Mr. Haney and Mr. Chambers, wherein he provided several proposals "to reestablish normal government-to-government relations with the Nation." *Id.* ¶¶ 55–58. The March 28, 2002 letter outlined several proposals that would facilitate resumption of government-to-government relations between the Nation and the DOI. Admin.R.Doc. 29. Item six of the Assistant Secretary's letter provided:

> The Department will not recognize the successors to the currently recognized Principal Chief or the Assistant Chief unless those successors are elected in an election in which all members of the Nation, including all Freedmen, are permitted to vote. The Department is willing to assist the Nation with the expense of such an election if the election is held promptly following the acceptance of these provisions.

*Id.* Secretary McCaleb stated that his assistant, Aurene Martin, would meet with the Nation's representatives in Oklahoma City. *Id.* The Nation responded to Mr. McCaleb's letter on April 1, 2002, and submitted a document in which it stated that it accepted "all proposals in full and [stated it was] willing to negotiate procedures as outlined in Item # 6 of the proposal." *Id.* ¶ 56. When no response to the Nation's letter was received, the Acting Chairman of the General Council sent a letter to Ms. Martin expressing concern over the fact that the BIA was continuing not to fund the Nation's programs. *Id.* ¶ 57. Finally, on April 15, 2002, Ms. Martin responded to the Acting Chairman's letter and she inquired about the forms used in the General Council election held in July 2001 that required one-quarter degree of Seminole Indian blood, as opposed to one-quarter degree of Indian blood, for candidates to run for the positions on the General Council for their individual Bands. *Id.*[9] Ms. Martin also stated that she needed to review the responses of the interested parties and would need more time to try to resolve these issues with plaintiff. *Id.* ¶ 58; Admin.R.Doc. 31.

**9.** Apparently, the DOI had learned that "at least several candidates for Indian Band representatives in the July 2001 election had been denied the opportunity to run for office because they possessed 1/4 Indian blood, but not 1/4 Seminole blood." Defendants' Cross–Motion for Summary Judgment ("Defs.' Mot.) at 9. This requirement was set forth on the face of the candidate application form and was contained in the Nation's election ordinances for "a number of years" and approved by the BIA in violation of the express terms of the Nation's constitution, which provides that one-fourth degree Indian blood is required to be a member of the General Council. *Id.* at 9–10; Seminole Constitution Art. IV, § 3. However, since 1981, the local Oklahoma BIA had erroneously approved the Nation's ordinances that required one-fourth degree Seminole blood that was in violation of the Nation's constitution. Pl.'s Resp. ¶ 29; Defendants' Statement of Material Facts Not in Dispute ("Defs.' Stmt.") ¶ 30. The DOI identifies several bands (the Hecete Band, the Hvteyievlke (Newcomer) Band, the Mekusukey Band, the Nurcup Harjo Band, the Ocese Band, and the Tusekia Harjo Band) that had certification problems with their elections. Defs.' Mot. at 11. Plaintiff contends that it did not learn until after a meeting conducted on March 8, 2002, that two individuals had sent letters to the DOI challenging their individual General Council Band elections. Pl.'s Stmt. ¶ 53. Secretary McCaleb's March 28, 2002, letter also raised this issue. *See* Admin.R.Doc. 29. However, it appears that the blood quantum requirement was first raised at a meeting held on February 12, 2002, between BIA officials and attorneys for the Nation. Pl.'s Reply at 14. During that meeting, the "BIA informed the Nation that they had received a letter complaining about the requirement of possessing 1/4 degree Seminole blood to stand for General Council. However, the BIA refused to share the letter with the Tribe." *Id.* at 14–15.

After several additional exchanges of correspondence, on April 24, 2002, the Assistant Secretary sent a letter addressed to both Mr. Haney and Mr. Chambers stating:

> We realize that there are a number of band representatives who were in office prior to the July 2001 elections and who were reelected. We will recognize those band members as validly elected holdover officials. We will also recognize as band representatives those individuals elected at new band elections which were open to all candidates of one quarter or more Indian blood and who were elected in accordance with their duly established band governing documents and practices. We will recognize a new constituted Seminole General Council consisting of band representatives elected prior to July 2001 and these newly elected band representatives.

*Id.* ¶ 59; Admin.R.Doc. 40. Plaintiff construes this letter as a final agency action by the defendant that amounted to recognition of the plaintiff's General Council. Pl.'s Stmt. ¶ 59. Defendants counter that the April 24, 2002 letter was not an indication that plaintiff's General Council, as constituted, was being recognized by the DOI, but was merely "a statement of the basis, the essential principles, on which the Department would recognize a newly constituted Seminole General Council." Defendants' Objections to Plaintiff's Statement of Material Facts Not in Dispute ("Defs.' Objections") ¶ 59. And, Mr. Chambers subsequently learned at a meeting held on May 24, 2002, that the Assistant Secretary's position was that new elections needed to be held for the General Council and for the positions of Principal Chief and Assistant Chief. *Id.* ¶ 65.

## II. *The Parties' Arguments*

### A.

According to plaintiff, the criteria contained in the Assistant Secretary's September 29, 2000 letter were satisfied when the General Council passed its resolution recognizing full participation of the Freedmen on the General Council and "[t]his alone renders DOI's subsequent refusal to recognize the General Council unlawful." Pl.'s Mot. at 25. Plaintiff also claims that the "DOI withdrew recognition of the General Council because the Freedmen had been removed from the Council. [Therefore, plaintiff argues that] [o]nce the Freedmen were recognized for full participation on the Council by passage of Tribal law ... [the] DOI can not refuse to recognize the Council." *Id.* Accordingly, the Nation opines that because it passed a tribal resolution to recognize the Freedmen, "[t]he September 29, 2000 final agency letter is void and the agency is acting outside the scope of its authority to enforce the de-recognition of the General Council based on that letter." *Id.* at 31.

Next, plaintiff argues that the Assistant Secretary has changed his position by not adhering to his recognition of the General Council as provided in his April 24, 2002 letter and has failed to provide a rational basis for not adhering to the September 2000 and April 2002 letters. *Id.* at 33. Plaintiff argues that the Secretary has acted arbitrarily and capriciously in refusing to recognize the General Council based upon the one-fourth Seminole blood requirement, especially since the Secretary has approved this requirement since at least 1981 and the Freedmen would not have participated in the other Band elections as provided in the Seminole Constitution. *Id.* at 31.[10]

---

**10.** Plaintiff also argues that the decision issued by Judge Kollar–Kotelly was not final and "did not require the Nation to do or to refrain from doing anything." Pl.'s Mot. at 32. As a result, plaintiff contends that there is no rational basis for the DOI not recognizing the results of the elections for Principal Chief and Assistant Chief because the "policy now being followed by BIA lacks a rational

Finally, the Nation argues that the BIA has violated the Act of October 1970, by in effect appointing Mr. Haney as Principal Chief when his term ended pursuant to the Nation's laws, on September 1, 2001. *Id.* at 35. Plaintiff now seeks judgment as a matter of law on the grounds that the DOI has violated the APA by failing to comply with the terms set forth in its September 29, 2000, final agency action letter; that the Assistant Secretary's April 24, 2002, letter was a final agency action that is binding and mandates that the DOI recognize the Nation's General Council; and, finally, that the Assistant Secretary violated the Act of 1970 when he continued to recognize Jerry Haney as the Principal Chief of the Nation.

### B.

Defendants have filed a cross-motion for summary judgment in which they take exception to the claims that their actions are in violation of the APA or the Act of 1970.[11] Specifically, defendants first argue that the final agency decision, as embodied in the September 29, 2000 letter was proper, and is supported by Judge Kollar-Kotelly's ruling. Defs.' Mot. at 16. Second, defendants argue that the April 24, 2002 letter does not constitute final agency action and therefore review of it under the APA is not proper. *Id.* at 21. Finally,

defendants argue that they are in full compliance with the Act of October 1970 by continuing to recognize Chief Haney because pursuant to the Nation's constitution, the Chief shall serve until his duly elected successor is installed. Defendants argue that this constitutional provision presupposes that there will be a lawful election and installation of a new Chief, and therefore, the last lawfully elected Chief, prior to the unlawful July 2001 election, was and remains Jerry Haney.[12] *Id.* at 22.

### III. *Standard of Review*

All the parties agree that this case is governed by the APA. Title 5 of the United States Code, § 706 provides in part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . .

basis." *Id.* The Nation also argues that the DOI's insistence that the Nation conduct a new election would require the Nation "to violate its own tribal Constitution . . ." *Id.* at 34. This would be the result, the Nation alleges, because the Nation's Constitution was created "under the Tribe's own inherent sovereignty and not through the Oklahoma Indian Welfare Act (OIWA")" [and therefore] there is no statutory authority for the BIA to require the Nation to violate its own Constitution." *Id.*

**11.** Plaintiff–Intervenor Chief Haney also opposes plaintiff's motion for summary judgment. Because Mr. Haney essentially supports the defendants arguments, his ar-

guments will not be detailed separately unless they differ in any material respects from defendants' arguments.

**12.** The Department ignored the efforts of the newly elected General Council to remove Chief Haney because the act was carried out by members who had been unlawfully elected and because the attempt to remove Haney was made "during a meeting of the . . . General Council in which only 13 members were present—a number that is two less than the constitutionally defined quorum." Defs.' Mot. at 8. In addition, only 16 members voted to remove Chief Haney, three less than what is constitutionally required. *Id.*

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

█ In reviewing the actions of the defendants, the first inquiry the Court must make is "whether the [Assistant Secretary] acted within the scope of his authority." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citation omitted). This inquiry also involves a "determination of whether on the facts the [Assistant Secretary's] decision can reasonably be said to be within [the] range [of his authority]." *Id.* After determining whether or not the Assistant Secretary acted within the scope of his authority, the Court must then decide, pursuant to 5 U.S.C. § 706(2)(A), whether "the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)); *MD Pharm., Inc. v. DEA*, 133 F.3d 8, 16 (D.C.Cir.1998) (same). In reaching its conclusion regarding this question, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814 (citation omitted). Finally, the Court must determine whether "the [Assistant Secretary's] action followed the necessary procedural requirements." *Id.* at 417, 91 S.Ct. 814. Although the Court must make a detailed inquiry into the facts and circumstances underlying the Assistant Secretary's actions, "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* However, "[t]he agency must articulate a 'rational connection between the facts found and the choice made.'" *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (citation omitted). Therefore, as this Court's Circuit has clearly held, "where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [this Court] must undo its action." *Petroleum Communications, Inc. v. F.C.C.*, 22 F.3d 1164, 1172 (D.C.Cir.1994) (citation omitted). Summary judgment should be granted where there exists "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV. *Analysis*

The plaintiff presents three main issues in its motion for summary judgment:

(1) Whether the DOI's refusal to recognize the Nation's General Council is arbitrary and capricious in light of the fact that the Nation has met the conditions stated in the September 29, 2000 letter?

(2) Whether the DOI's April 24, 2002 letter is final agency action that recognized the Nation's General Council, which therefore makes the DOI's refusal to recognize the Nation's General Council arbitrary and capricious? And

(3) Whether the Assistant–Secretary has violated the Act of 1970 by continuing to recognize Jerry Haney as the Nation's Principal Chief?

In determining the answers to these issues, the Court is guided by the fact that the Nation is a sovereign entity and, as such, has the right to self-government. *Wheeler v. United States Dep't of the Interior*, 811 F.2d 549, 553 (10th Cir.1987); *Ransom v. Babbitt*, 69 F.Supp.2d 141, 149 (D.D.C.1999) ("The roots of the concept of tribal sovereignty and self-determination

reach back at least to the Constitution itself. *See e.g.,* U.S. Const. art. I, § 8, cl. 3 (granting Congress the power 'to regulate Commerce with foreign Nations, and among the several states, and with the Indian Tribes.' ")); *Harjo v. Kleppe,* 420 F.Supp. 1110, 1143 (D.D.C.1976), *aff'd sub nom. Harjo v. Andrus,* 581 F.2d 949 (D.C.Cir.1978) ("federal policy in fact now recognizes self-determination as the guiding principle of Indian relations.").

Article XIII, § one of the Seminole Constitution vests the Commissioner of Indian affairs with the authority to approve amendments to the Seminole Constitution. *See also Seminole I,* at 6 (holding that the DOI is authorized, pursuant to Article XIII of the Seminole Constitution and the Act of 1970, to approve amendments to the Seminole Constitution). None of the parties seriously dispute whether the Secretary has the authority to withhold its recognition of tribal representatives who were elected in violation of the Nation's constitution. Indeed, a prior member of this Court has explicitly held that the Secretary of the DOI "has the authority to interpret the tribal constitution in order to determine who will be recognized as the tribal representative for the purpose of carrying out federal relations with the tribe." *Milam v. United States Dep't of the Interior,* 10 ILR 3013, 3015 (D.D.C. Dec. 23, 1982). The issue of principle dispute between the parties is whether the Secretary has violated the APA by refusing to recognize the Nation's General Council in light of the fact that the Nation has now re-recognized the Freedmen for inclusion on the General Council.

(A) *The September 29, 2000 letter*[13]

▆▆▆▆ The issue now before this Court is narrowed to whether or not the DOI has continued to act rationally in light of the fact that the Nation has since adopted a resolution purporting to re-recognize the participation of the Freedmen on the General Council. Plaintiff argues that the September 29, 2000, letter set forth the conditions upon which the DOI would recognize the Nation's General Council and this condition was limited to the participation of the Freedmen in the General Council. In this Court's view, this reading of the September 29th letter is too restricted. The Assistant–Secretary's letter provides, in pertinent part:

> Additionally, be advised that for purposes of carrying out the government-to-

**13.** As a preliminary matter, the Court must address Plaintiff–Intervenor Jerry Haney's unsubstantiated argument that the plaintiff has no standing in this matter and cannot speak on behalf of the Tribe. Plaintiff–Intervenor's Opposition to Plaintiff's Motion for Summary Judgment ("Pl.–Int.Opp.") at 1, 15. To have Article III standing, "a litigant must demonstrate an injury in fact that is fairly traceable to the challenged action of the defendant and redressable by a favorable decision." *Bush–Quayle '92 Primary Comm., Inc. v. Federal Election Comm'n,* 104 F.3d 448, 451 (D.C.Cir. 1997) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Plaintiff in this action has met this requirement. The defendants' actions in refusing to recognize the General Council that plaintiff represents confers a sufficient "injury in fact" to plaintiff. In addi-

tion, a favorable decision by this Court in plaintiff's favor would redress that injury. *See MD Pharm., Inc. v. DEA.,* 133 F.3d 8, 11–12 (D.C.Cir.1998) (holding plaintiff, that challenged agency action that approved another company's pharmaceutical drug application, had standing; plaintiff suffered injury in fact that was "redressable because vacating the approval of the [company's] application would secure the relief from competition to which [plaintiff] says it is entitled under the statute.") (citation and internal quotation marks omitted). Although Plaintiff–Intervenor may dislike the fact that the plaintiff has instituted this action on behalf of the "Seminole Nation," which Mr. Haney purports to still represent as its Chief, this does not affect the Court's standing decision. Nor does Mr. Haney cite any case law to support the proposition that it should.

government relationship between the United States and the Seminole Nation ... *we will not recognize any future resolutions or actions of the General Council without the participation of the Freedmen.* The exclusion of the Freedmen from participation in the Nation's government in violation of the treaty rights guaranteed to them in 1866 means that the United States cannot discharge its trust responsibilities to the Seminole Nation through the General Council *because that governing body is no longer lawfully constituted. . . .* I regret having to take this action; however this decision is final for the Department of the Interior.

Admin.R.Doc. 9 at 20 (emphasis added). To the extent that Judge Kollar–Kotelly

determined that the DOI did not act arbitrarily or capriciously in its refusal to conduct government-to-government relations with the Nation, in light of the Nation's constitutional amendments that attempted to exclude the Freedmen from membership in the Nation, this Court will not revisit that determination. *See Yamaha Corp. v. United States,* 961 F.2d 245, 254 (D.C.Cir.1992) (holding that the doctrine of issue preclusion prevents a court from re-litigating an issue that has been raised and determined in a prior judicial proceeding; "once an issue is raised and determined, it is the entire issue that is precluded, not just the particular arguments raised in support of it in the first case.") (citations omitted).[14]

**14.** The requirements for issue preclusion to apply are:

■ the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case. . . . [2][T]he issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case. . . . [3][P]reclusion in the second case must not work a basic unfairness to the party bound by the first determination.

*Yamaha,* 961 F.2d at 254 (internal citations omitted).

The court finds that these requirements are met in this case. This case involves the same parties as those involved in *Seminole I,* as well as many of the same legal issues. To the extent those issues were decided in the prior opinion, the Court finds no reason to re-visit them here.

Plaintiff in this matter, however, has suggested that because the District of Columbia Circuit Court held that Judge Kollar–Kotelly's ruling was not final for the purpose of appealability, the "decision has no effect—retroactive or otherwise . . ." Pl.'s Mot. at 32. Plaintiff's argument ignores the fact that a decision need not be final for appealability purposes to have preclusive effect. In holding that Judge Kollar–Kotelly's order remanding the remaining six amendments back to the DOI was not

a final order, the Circuit Court relied upon *Pueblo of Sandia v. Babbitt,* 231 F.3d 878, 881 (D.C.Cir.2000), which held that the district court's order there, which remanded the case to the DOI, was not final for the purpose of appellate jurisdiction under 28 U.S.C. § 1291 (2000). 2002 WL 1364249, at *1 (other citations omitted). However, "[w]hether a judgment, not final in the sense of 28 U.S.C. § 1291 ought nevertheless be considered 'final' in the sense of precluding further litigation of the same issue, turns upon such factors as the nature of the decision . . ., the adequacy of the hearing, and the opportunity for review." *Lummus Co. v. Commonwealth Oil Refining Co.,* 297 F.2d 80, 89 (2d Cir. 1961), *cert. denied* 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962). Finality in regards to issue preclusion therefore, "may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again." *Id.; see also LaRouche v. United States Dep't of Treasury,* 112 F.Supp.2d 48, 56 (D.D.C.2000) ("[f]inality for purposes of issue preclusion is a more 'pliant' concept than it would be in other contexts."). Therefore, although Judge Kollar–Kotelly's opinion did not address the election that is at issue in this case, to the extent she addressed issues regarding the DOI's authority to approve the constitutional amendments at issue and the

The September 29th letter clearly expresses the DOI's position that it will not recognize future actions of the General Council in the absence of the Freedmen's full participation in the General Council, and therefore, no resolutions of the General Council as constituted, without the Freedmen, would be recognized. The Tribal Resolution that the Nation relies upon as satisfying the conditions contained in the September 29, 2000, letter was not adopted by a validly constituted General Council. *See* Defs.' Mot. at 19 ("Th[e] Resolution ... was adopted by the illegally constituted General Council and was signed by Ken Chambers as Principal Chief, an official who was elected without the participation of the Freedmen."); Admin.R.Doc. 14. Thus, until the General Council is validly constituted, the Department refuses to acknowledge any resolutions by the Council, including the one purportedly recognizing the participation of the Freedmen.[15] This decision by the DOI was based upon the Nation's Constitution and the Treaty of 1866 that secures the rights of the Freedmen to be a part of the Nation. The BIA's justification was not novel as it has been reiterated repeatedly and confirmed in the litigation before Judge Kollar–Kotelly. *Cf. Oglala Sioux Tribe v. Andrus,* 603 F.2d 707, 719 (8th Cir.1979) (holding BIA acted arbitrarily and capriciously in making its decision "pursuant to a previously unannounced ... policy ..."). Nor is this a case where the BIA is acting in blatant disregard of the Nation's Constitution. *Cf. Ransom,* 69 F.Supp.2d at 153 (holding BIA

acted arbitrarily and capriciously where it disregarded the plain language of the tribe's constitution). Therefore, the Court cannot conclude that the BIA's refusal to recognize resolutions of the General Council after the July 2000 election was arbitrary, capricious or contrary to law. *See Bowman,* 419 U.S. at 281, 95 S.Ct. 438 (upholding agency's decision where the court was able to "discern ... a rational basis for its treatment of the evidence, and the 'arbitrarily and capricious' test does not require more"); *MD Pharm. Inc.,* 133 F.3d at 17 (upholding agency's decision as it "gave an explanation for its decision" and "[t]aken as a whole, [the agency's] explanation demonstrates that it examined the data, considered the relevant factors, and made a reasonable judgment based on the record."); *Star Lake R.R. Co. v. Lujan,* 737 F.Supp. 103, 109 (D.D.C.1990) (upholding IBIA decision as reasonable based upon its interpretation of its regulations); *United States v. Pawnee Business Council,* 382 F.Supp. 54, 59 (N.D.Okla. 1974) (upholding Secretary's decision not to recognize results of illegally conducted tribal election).

In agreeing with the defendants' position that they were obliged to not recognize the General Council's resolution, which was enacted in the absence of the Freedmen, the Court is mindful that it can only do so with great caution. As plaintiff correctly points out throughout its reply/opposition to defendants' cross-motion for summary judgment, the Supreme Court "has recognized the [Nation's] right

---

legality of its actions in declining to recognize the Nation in the absence of the Freedmen, the Court will not re-address such issues.

**15.** In addition, the defendants have stated they are wary of the Nation's intentions regarding participation by the Freedmen in the governance of the Nation "after the Department learned of the referendum vote on a new Seminole Constitution on April 27, 2002,

which, once again, attempts to completely eliminate[ ] the Freedmen from tribal membership." Defs.' Mot. at 19; Admin.R.Doc. 19 (Draft of Seminole Constitution to be voted on January 1, 2002, providing that membership in the Nation "shall consist of all Seminole Indian citizens by blood" or one who is "either an original Seminole Indian enrollee or a descendant of a Seminole Indian original enrollee ...").

to self-government as a fundamental aspect of tribal existence." Plaintiffs Opposition to Defendant's Cross–Motion for Summary Judgment ("Pl.'s Opp'n") at 5. Plaintiff argues that when the government is faced with an issue regarding what tribal entity to recognize, it must do so in "harmony with the principles of tribal self-determination." *Ransom*, 69 F.Supp.2d at 150 (quoting *Wheeler v. U.S. Department of Interior*, 811 F.2d 549, 551 (10th Cir. 1987)).

In *Ransom*, the Court held that the BIA and IBIA "acted arbitrarily and capriciously" in determining that the Saint Regis Mohawk Tribe had validly adopted its Constitution and therefore the only legitimate representatives of the tribe were the holders of offices named in the Constitution. The Saint Regis Mohawk Tribe had, from 1802 until 1995, operated under a Three Chief System of government "whereby three Chiefs, elected by Mohawk voters, together acted as the Tribe's governing body for staggered, three-year terms." *Id.* at 143. On June 3, 1995, the tribe held a referendum election to determine whether it should adopt a Tribal Constitution that would create three branches of tribal government, thus replacing the Three Chief System of government. *Id.* The Constitution, by its own terms, required a vote of fifty-one percent of those present for its adoption. *Id.* The results of the first election "suggested that the Tribal Constitution question failed" as only 50.935093 percent voted in favor of adopting the new constitution. *Id.* Yet, shortly after the vote, the Tribal Clerk certified and the Three Chiefs witnessed that a "majority of those present and casting valid ballots voted in favor of adopting the tribal constitution ..." *Id.* This result was accompanied by several years of tribal division, and on May 23, 1996, the new Legislative Council added a referendum question to the ballot for the June 1, 1996, election, inquiring whether the "Tribal

Constitution of the Saint Regis Mohawk Tribe" was valid. *Id.* The overwhelming response indicated that the constitution was invalid. *Id.* at 144. In response, the Tribal leaders rescinded the prior, erroneous certification of the Constitution and also called for another referendum to be held posing the question "Do you favor continuing with our present elected officials?" *Id.* This referendum resulted in the overwhelming majority of the Tribe voting in favor of new elections, which the Tribe held on June 29, 1996. *Id.* The newly elected Chiefs of the Nation contacted the BIA so that the Bureau would recognize them as the newly elected government of the Tribe. *Id.* However, the BIA's Acting Eastern Area Director declined to recognize the Three Chief's Government, stating that the incumbent members of the Tribal Council, as established by the change to the putative Constitution, comprised the lawful body of the tribe. *Id.* The BIA based its decisions on concerns of the Tribal Court, which questioned the validity of the adopted Constitution. However, the Tribe argued that the Tribal Court Judge's rulings were invalid because she "acted without appropriate authority and was not a member of the Tribe." *Id.* at 145 n. 3. In addition, the Tribal Court's authority stemmed from the now-rejected Constitution. *Id.* The tribe appealed the BIA's decision to the IBIA, which affirmed the Acting Director's decision. *Id.* at 145. In holding that the BIA and IBIA acted arbitrarily and capriciously, the district court noted that "[i]n situations of federal-tribal government interaction where the federal government must decide what tribal entity to recognize as the government, it must do so in harmony with principles of tribal self-determination." *Id.* at 150 (citation omitted). The court found that the "BIA and the IBIA had the authority to review Tribal procedures to ensure that the Tribal Court rul-

ings on which they relied were reasonable." *Id.* at 151. The court found that "[t]he plain language of the Constitution indicate[d] that 51% of the voters had to approve it"[16] and that

> [b]oth the record before the IBIA and its legal obligation to respect tribal sovereignty and self-determination should have led it to reject the BIA's determination that the Tribe's Constitution was valid. Aside from the simple fact that 51% of the voters in the Tribal referendum did not choose to adopt the Constitution, the very language of the Tribal Court decisions should have given Defendants pause before they adopted that Court's findings as federal policy.

*Id.* at 152. Finally, the Court also noted that the record suggested that the "BIA wanted the Tribe to embrace a constitutional form of government[,]" and that it "took steps to frustrate the will of the Tribe and to support the Constitutional regime." *Id.* at 154. Despite the fact that the

> referendum results made clear that the Tribal Court had no authority, the BIA and IBIA simply ignored the results.... The essence of tribal self-determination is the Tribe's ability to choose for itself how its government will operate. For Defendants to refuse to acknowledge that choice because they disagree with it, or to actively seek to institute the form of government that they prefer, turns that notion on its head. Defendants' repeated refusal to recognize the Tribe's earnest efforts to undo its contentious certification of the Constitution, couched in the language of respect for tribal sovereignty, is disingenuous at best. Upon review, Defendants' actions

reveal themselves to be arbitrary, capricious, and contrary to law.

*Id.* at 155.

*Ransom* is distinguishable from the present situation. First, there was no issue in *Ransom* regarding the Tribe's efforts to unconstitutionally disenfranchise members of the Tribe. Second, the BIA/IBIA's justification for its decision was based upon invalid authority, *i.e.*, the Tribal Court Judge. In this case, the BIA is relying upon the Nation's own constitution which itself requires Department approval of amendments to it and requires participation by the Freedmen in the governance of the Nation.

Plaintiff also relies upon *Harjo*, 420 F.Supp. at 1110, for the proposition that the BIA has violated the APA in failing to recognize the Nation's General Council. In *Harjo*, members of the Creek Nation sought declaratory and injunctive relief against the DOI for refusing to recognize or interact with the Creek's national council and in only recognizing and dealing with the Creek Nation's Principal Chief. The DOI argued that several federal laws had extinguished the tribal form of government, established by the Creeks in their 1867 Constitution, which established the executive, legislative and judicial branches of the Creek Nation's government. *Id.* at 1120. In holding that the DOI had "acted illegally in recognizing the Principal Chief as the sole embodiment of the government in the Creek Nation" the Court held that the Creek Nation's form of government, although challenged by the federal government, "has persisted more than half a century [under] the most adverse conditions imaginable." *Id.* at 1142. Although several acts by Congress had sought to terminate the Creek's tribal form of govern-

---

**16.** The Court noted that "[a]lthough the Constitution in question is not a federal statute ... federal courts have limited the construction of words to their clear meaning when to

do otherwise would intrude upon tribal sovereignty." *Ransom*, 69 F.Supp.2d at 152 (citing *Utah v. Babbitt*, 830 F.Supp. 586, 596 (D.Utah 1993), *aff'd* 53 F.3d 1145 (10th Cir.1995)).

ment, the Court concluded that "[n]othing in the Acts of 1898, 1901, 1906 or any other legislation abolished the Creek National Council or stripped it of its power to determine the uses to which tribal funds are to be put ... [and therefore] the elected legislature created by the 1867 constitution (and effectively re-established at least twice thereafter) [is] the authoritative body for initial allocation of tribal funds." *Id.* at 1143.

*Harjo* is again distinguishable from the instant case because there the DOI relied on an incorrect interpretation of the law and legislative history in concluding that the Creek Nation's tribal government had been abolished and that it therefore was justified in refusing to recognize it. Again, here, the Seminole Nation has disregarded its own Constitution and in the process sought to disenfranchise members of the tribe and preclude them from participating in the governance of the Nation.

█ However, even though plaintiff's own faulty conduct is the cause for the current dispute between the parties, it is also correct that the government, in its dealings with Indian tribes, must nevertheless respect the tribe's right to self-government. *Wheeler*, 811 F.2d at 553. In *Wheeler*, the plaintiff, who had been an unsuccessful candidate for principal chief, sought to have the election procedures investigated by the BIA. *Id.* at 550. Having been unsuccessful in redressing his concerns through the process of exhausting his tribal remedies, the plaintiff petitioned the Superintendent of the BIA to "conduct an investigation and a hearing regarding

the election procedures, to stay certification of the election results and to freeze all BIA funding to the Cherokee Nation pending the outcome of the petition." *Id.* The BIA denied these requests and referred plaintiff to the tribe's Tribunal's decision. *Id.* In upholding the DOI's refusal to interfere in the tribe's election, the Court held that the DOI did not have authority to interfere with the tribal election. *Id.* at 553. Important to this decision was the fact that the BIA had determined that the "legally constituted tribal government was functioning within the scope of its power and, thus, the Department was obligated to recognize the tribal court decisions rendered in this matter." *Id.* at 550. Also significant was the fact that the tribe had its own forum for resolving the dispute because, "when a tribal forum exists for resolving a tribal election dispute, the Department must respect the tribe's right to self-government and, thus, has no authority to interfere." *Id.* at 553.[17]

The Court respects and understands the Seminole Nation's right to self-government. However, unlike *Harjo*, *Ransom*, and *Wheeler*, there is an element here of oppressive action on the Nation's part against its own minority members. As another member of this Court has recognized: "The Secretary of the Interior is charged not only with the duty to protect the rights of the tribe, but also the rights of individual members. And the duty to protect these rights is the same whether the infringement is by non-members or by members of the tribe." *Milam*, 10 ILR at 3017. In addition, the "BIA has a strict

---

17. The *Wheeler* court noted that there may be "special situations" that require the DOI to interfere with a tribe's internal affairs:

> If a tribe's constitution or its statutes call for the Department to take an active role in lawmaking, the Department may refuse to recognize laws that the tribal authorities have passed.... Furthermore, certain federal statutes require Department involve-

ment in tribal matters.... Finally since the Department is sometimes required to interact with tribal governments, it may need to determine which tribal government to recognize.... [However,] even these special situations should be resolved in favor of tribal self-determination and against Federal Government interference. 811 F.2d at 552.

and heavy burden to administer funds to be distributed to Indians consistent with the highest fiduciary standards[,]" and therefore its withholding of tribal assets "is consistent with its role as trustee, and with its responsibility under the Indian Self–Determination Act." *Id.* Thus, the Court concludes that the Secretary has not acted arbitrarily, capriciously or otherwise not in accordance with the law in refusing to recognize the General Council or the Principal Chief and Assistant Chief who were elected without the participation of the Freedmen.

Despite the circumstances under which this case appears before the Court, it must nevertheless attempt to resolve this dispute without sacrificing the Nation's right to retain its integrity and its right to self-determination. But it was plaintiff, not the DOI, who sought to adopt amendments to its constitution that would disenfranchise the Freedmen from participation in the political operations of the Nation, in total disregard of the rights afforded to those members by the Treaty of 1866 and the Nation's Constitution. *See Seminole I,* at 6. Nonetheless, at oral argument, plaintiff's counsel stated that the goodwill of the Seminole Nation should be accepted as credible. Yet, as indicated above, just recently, on April 27, 2002, the Nation again sought to exclude the Freedmen from the Nation in yet another referendum election. *See* Admin.R.Doc. 44. This, therefore, is not a case where the DOI has, without proper and legal reason, interjected itself into this situation to impose its will on an Indian tribe just for the sake of doing so. *Cf. Ransom,* 69 F.Supp.2d at 154 (BIA "took steps to frustrate the will of the Tribe and to support the Constitutional regime."). Rather, this is a situation where the DOI has sought to protect minority members of the tribe from the discriminatory actions of the overwhelming majority of the tribe.

The facts presented in *Milam* provide a helpful analogy to the present situation. In *Milam,* plaintiffs, who had been elected Principal Chief and Assistant Chief of the Seminole Nation, had been removed by the General Council by a resolution. 10 ILR at 3013. BIA officials stated that the resolution, which had been ratified at a scheduled meeting of the Council, was valid and therefore recognized the removal of plaintiffs from their tribal offices. *Id.* at 3014. Plaintiff filed a complaint seeking review of the DOI's final decision and to "find that the decisions of the BIA to recognize the results of the meeting, freeze tribal accounts, and order plaintiffs to vacate the tribal complex, were unlawful and arbitrary and capricious." *Id.*[18] In determining whether the Secretary's actions were lawful, the court acknowledged that the Secretary "has the authority, and the obligation, to recognize changes in tribal representation." *Id.* at 3015. In addition, the court held that "the Secretary has the authority to interpret the tribal constitution in order to determine who will be recognized as the tribal representative for the purpose of carrying [out] federal relations with the tribe." *Id.* In elaborating on the Secretary's authority, the Court stated:

> The obligation of the BIA to review a tribal constitution is justified under its trust responsibility to administer the government-to-government relations between the United States and the Indian tribes. Congress has expressly vested in the Commissioner of Indian Affairs the authority for the 'management of all Indian affairs and of all matters arising out of Indian relations.'

---

**18.** Plaintiffs in *Milam* had also brought a claim pursuant to the Indian Civil Rights Act alleging "a conspiracy to deprive plaintiffs [of] equal protection of the laws under 42 U.S.C. § 1985(3)." 10 ILR at 3014.

*Id.* (citing 25 U.S.C. § 2). Therefore, the court concluded that the BIA "was obligated under its trust responsibility to determine who, for the purposes of relations with the BIA, was to be the tribal representative." *Id.* However, the Court noted that the "doctrine of trust responsibility" could not be used "to invade the legitimate domain of tribal sovereignty." *Id.* at 3016. In concluding that the government had acted in an arbitrary and capricious manner, the *Milam* court looked to the provisions of the Seminole Constitution and concluded that the meeting at which the resolution removing the plaintiffs from their respective positions of Principal Chief and Assistant Chief had been ratified was conducted in violation of the Seminole Constitution, which required that notice of such meetings had to be given at least ten days in advance of the meeting. *Id.* The evidence revealed that at least five council members had not received notice of the council meeting and had been unaware that it had been held. *Id.* The court noted that "[t]his is not an instance where tribal custom or tradition may be used to construe an ambiguous constitutional provision. The notice provision is entirely clear on its face. Neither the Secretary, nor the Indians themselves, may ignore the express provisions of the constitution." *Id.* at 3017. Therefore, the Court restrained the Secretary "from taking any further

action that has the effect of recognizing the removal of plaintiffs as officers of the Seminole Nation." *Id.* However, the Court concluded that it did *not* find that the

> Secretary's decision to freeze BIA funds in tribal accounts was also unlawful, or arbitrary and capricious.... The long-standing controversy that has divided the Indian tribes into competing factions has cast into doubt the representativeness of the General Council and its officers, and has threatened the integrity of the trust funds over which the BIA has ultimate authority and responsibility.... [T]he BIA has a strict and heavy burden to administer funds to be distributed to Indians consistent with the highest fiduciary standards.... The court finds that the Secretary's decision to withhold tribal assets is consistent with its role as trustee, and with its responsibility under the Indian Self–Determination Act.

*Id.; see also Pawnee Business Council,* 382 F.Supp. at 59 (holding that Secretary of the Interior "act[ed] within his jurisdiction" where he determined that an Indian official had been validly removed from his position as president of the business council and that a new candidate had been elected to the position, "all such determinations being made under and pursuant to the Constitution and By–Laws of the Pawnee Indians of Oklahoma.").[19]

---

**19.** Plaintiff notes that in *Pawnee Business Council,* the federal officials "obtained an injunction against specific tribal officials because the Secretary determined that the Secretarial elections were illegal." Pl.'s Reply at 11. Plaintiff argues that the government in this case could have taken similar action which would have been "less intrusive than a complete derecognition of all actions of the Tribe." *Id.* Such action was not necessary. In *Pawnee Business Council,* the court, in upholding the Secretary's refusal to recognize the results of an election that had been conducted at the behest of the ousted president,

defendant Chapman, noted that "[t]he Chapman group was not misled by [p]laintiff about the May 5, 1973 election. To the contrary, they were told in advance thereof by [p]laintiff that the election was illegally called. No erroneous findings by the Secretary of the Interior of any significance are found to be present." 382 F.Supp. at 59. As in *Pawnee Business Council,* the defendants in this action provided plaintiff with sufficient forewarning that any actions taken in the absence of the Freedmen would not be recognized. Thus, plaintiff's position that what the DOI

■ Similarly, in this case, the DOI has the authority and responsibility to ensure that the Nation's representatives, with whom it must conduct government-to-government relations, are the valid representatives of the Nation as a whole. *See Seminole Nation v. United States,* 316 U.S. 286, 296, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942) ("Payment of funds at the request of a tribal council which, to the knowledge of the Government officers charged with the administration of Indian affairs and the disbursement of funds to satisfy treaty obligations, was composed of representatives faithless to their own people and without integrity would be a clear breach of the Government's fiduciary obligation."). Therefore, the Court concludes that the DOI has not acted in an arbitrary, capricious manner or otherwise not in accordance with the law, in refusing to conduct government-to-government relations with the Nation's General Council because the Tribal resolution that was adopted recognizing the Freedmen was done by an unlawfully constituted Council.

### (b) *The One–Quarter Seminole Indian Blood Requirement*

Although the Court concludes that the DOI has not violated the APA by continuing to refuse to recognize the plaintiff's General Council, the Court must address the defendants' argument that its action in not recognizing the Nation's General Council is "further supported after they learned of information concerning the inability of certain" candidates to run for General Council positions because of the one-quarter Seminole Indian blood requirement. Defs.' Mot. at 17. Plaintiff argues that this justification for non-recognition of the Nation's General Council was

did here was more intrusive than what it did in *Pawnee Business Council* is refuted by the fact that defendants sought to resolve this dispute with the Tribe in the absence of judicial intervention. This conciliatory effort by

not expressed until March 8, 2002, and therefore cannot be relied upon by the defendants as justification for the September 29th letter. Pl.'s Reply at 15. Plaintiff also argues that the defendants have, for nearly two decades, approved tribal ordinances that required candidates for General Council to possess one-quarter degree of Seminole, as opposed to one-quarter Indian, blood. *Id.* Defendants acknowledge this long term Seminole blood line approval, but contend that the local BIA authorities who approved the ordinances acted erroneously in direct contradiction with the Nation's own constitution. In Mr. McCaleb's April 24, 2002 letter he stated:

It has come to our attention that the candidate filing forms for the 2001 General Election stated on their face that, to be qualified, the candidate had to possess "one-quarter degree Seminole blood." We recognize that the requirement for "one-quarter degree Seminole blood" is consistent with Seminole election ordinances previously approved by Bureau officials. It would appear, however, that this requirement is in excess of the terms of Article IV, section 3, of the Seminole Constitution which merely requires one quarter degree Indian blood for General Council members. *The previous Bureau approvals can not, however, relieve us of our obligation to adhere to the strict terms of the approved tribal constitution.*

Admin.R.Doc. 40 (emphasis added).

The first issue that is presented by this letter is whether or not it constitutes final agency action. Plaintiff argues that this letter "determined the rights and obli-

the DOI appears to the Court to be actually "less intrusive" than filing a lawsuit seeking to enjoin the Nation from conducting elections that the Nation had been advised would be in direct violation of its own Constitution.

gations of the Seminole Nation General Council and the BIA. From the recognition, legal consequences would flow." Pl.'s Reply at 17. Defendants counter that "the April 24, 2002, letter was merely a letter in furtherance of negotiations designed to resolve the government recognition issue." Def.'s Mot. at 20.[20]

 "Agency action" is defined as "including the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act ..." 5 U.S.C. § 551(13) (2000). This Circuit has held that the "term 'agency action' encompasses an agency's interpretation of the law." *Ciba–Geigy Corp. v. United States Envtl. Protection Agency*, 801 F.2d 430, 435 (D.C.Cir.1986). Pursuant to the APA, this Court is permitted to review " 'final agency action' for which there is no other adequate remedy in a court." *Transport Robert (1973) LTEE v. United States Immigration & Naturalization Service*, 940 F.Supp. 338, 340 (D.D.C. 1996) (quoting 5 U.S.C. § 704). To be final, agency action must meet two conditions: "[f]irst, the action must mark the 'consummation' of the agency's decision-making process ... it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow ...'" *Barrick Goldstrike Mines, Inc., v. Browner*, 215 F.3d 45, 48 (D.C.Cir.2000) (citations omitted). In determining whether agency action is final for purposes of judicial review, the court "look[s] primarily to whether the agency's position is 'definitive' and whether it has a 'direct and immediate ... effect on the day-to-day business' of the parties challenging the action." *Ciba–Geigy Corp.*, 801 F.2d at 435–36 (citations omitted).

It is ironic that plaintiff chooses to seize upon the April 24, 2002, letter as constituting the DOI's recognition of the Nation's General Council. First, while the letter stated that the Department would "accept as validly elected" certain candidates elected in the July 2001 election, in the following paragraph, the letter provides that "[t]he Department will *not* recognize the representatives from those Bands which had candidates who were issued letters of non-certification until the Band holds a new election ..." Admin.R.Doc. 40 (emphasis added). In addition, the letter notes that the one-quarter degree Seminole blood requirement conflicts with the Constitutional provision requiring one-quarter Indian blood and, although the Bureau had previously approved the one-quarter degree Seminole blood requirement, these prior approvals "can not, however, relieve [the Department] of our obligation to adhere to the strict terms of the approved tribal constitution." *Id.* Finally, in the portion of the letter relied upon by plaintiff, it states:

> We realize that there are a number of band representatives who were in office prior to the July 2001 elections and who were reelected. We will recognize those band members as validly elected holdover officials. We will also recognize as band representatives those individuals elected at new band elections which were open to all candidates of one quarter or more Indian blood and who were elected in accordance with their duly established band governing documents and practices. We will recognize a new constituted Seminole General Council consisting of band representatives elected prior to July 2001 and these newly elected band representatives.

---

**20.** Defendants also make the argument that the review of this letter by the Court would violate the doctrine of sovereign immunity because, "[a]s a sovereign, the United States is immune from suit except when it consents to be sued." Def.'s Mot. at 20.

*I can assure you that we remain anxious to discuss with all parties every possible means of resolving all remaining issues in the current and to ensure the provision of essential services to the Seminole tribal members in the interim.*

Admin.R.Doc. 40.

This letter clearly expresses the Department's desire to continue "to discuss with all parties" potential methods of "resolving all remaining issues ..." Why this statement was included if indeed the letter was a final decision to recognize the Nation's General Council is beyond the Court's comprehension. In addition, the statement regarding the Department providing "essential services to the Seminole tribal members in the interim" would not have been necessary if, as plaintiff contends, this letter recognized the General Council. Recognition of the General Council would have resulted in the re-establishing of government-to-government relations and the release of the trust and appropriated funds by the Department, which would have made the need for interim services unnecessary. *See Impro Products, Inc. v. Block,* 722 F.2d 845, 850 (D.C.Cir.1983) (holding letter by agency in response to plaintiff's "numerous inquiries" did not constitute final agency action; the plaintiff "pursued its own informal routes of inquiry for ten years and then decided to characterize its 1981 letter to the [agency] as a request for a final resolution.... [I]t is surely a frivolous contention to suggest that [the agency] is somehow bound by [plaintiff's] self-serving characterization of the 1981 letter as a request for a final ruling."), *cert. denied* 469 U.S. 931, 105 S.Ct. 327, 83 L.Ed.2d 264 (1984).

▮ While the Court finds that the April 24, 2002, letter did not constitute final agency action concerning the recognition of the General Council, it concludes that the letter did provide guidance as to how the Council could gain recognition,

and reiterated in writing what had been verbally stated earlier about another problem the DOI had discovered (*i.e.,* the one-quarter Indian blood requirement) that had not been provided in the September 29th letter. And the Circuit Court for this District has clearly held that "a guidance document reflecting a settled agency position and having legal consequences for those subject to regulation may constitute final agency action" for the purpose of judicial review. *Barrick,* 215 F.3d at 48. The April 24, 2002 letter also reiterated, in several respects, the conditions as set forth in the Assistant Secretary's March 28, 2002 letter, and explicitly references the one-quarter Seminole blood requirement issue. Admin.R.Doc. 29. Thus, it is clear that the agency has now adopted as an additional reason for refusing to recognize the General Council the fact that certain elections may have been tainted by the one-quarter Seminole blood requirement in violation of the Nation's Constitution, which the agency has reiterated several times to plaintiff. This is sufficient to constitute final agency action on this subject. *See Barrick,* 215 F.3d at 48–49 ("we have recognized that final agency action may result 'from a series of agency pronouncements rather than a single edict.'") (quoting *Ciba–Geigy,* 801 F.2d at 435 n. 7). Moreover, the Court has no reason to believe the defendants plan to abandon this position. *See Barrick,* 215 F.3d at 50 ("nothing .... indicates that the [agency's] position on this subject is tentative. The March letter is firm and conclusive ... [as it] state[s] what must be done to comply with the [agency's] ... program.").

It is clear that the April 24th letter would have consequences for the Nation because, even if it had re-admitted the Freedmen to participation on the Council, it is clear the defendants would still have another objection to the Council's composition. Thus, this issue is "ripe for judicial

review ... [as][t]he questions presented are purely legal ... [and the Court can not] imagine [anything] happening that would bring the issues into greater focus or assist in determining them." *Id.; see also Transport Robert,* 940 F.Supp. at 340 (recognizing that the "finality requirement is similar to the requirement of ripeness ... [which] requires courts to consider ... 'the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration.' ") (citations omitted). Ripeness is evident because if the Nation's one-quarter Seminole requirement has not been abolished for all Band elections, the DOI will not recognize the General Council for purposes of re-establishing government-to-government relations. *See id.* (holding agency action "ripe for judicial review" where there was the "prospect of hardship" to the plaintiff; plaintiff's "only alternative to judicial review now is to violate [the agency's] directives ... and then defend an enforcement proceeding on the grounds it raises here."); *Ciba–Geigy,* 801 F.2d at 436 (holding agency letter was final action for purposes of judicial review where the letter "unequivocally stated that [agency's] position" ... [and] it gave no indication that it was subject to further agency consideration or possible modification."). The Court therefore concludes that the defendants' steadfast position regarding the one-quarter Seminole Indian blood requirement has been sufficiently reiterated so as to constitute the agency's final position on this matter.

■ Having determined that the agency's position is ripe for review, it is clear to the Court that the defendants have abandoned their prior decisions approving election ordinances that required one-quarter Seminole blood. An agency's departure from its prior decisions can be considered to be arbitrary, capricious and an abuse of discretion, especially where the agency "has failed to explain its departure from

prior precedent." *Bush–Quayle '92 Primary Comm. v. Federal Election Comm'n,* 104 F.3d 448, 453 (D.C.Cir.1997); *see also Oglala,* 603 F.2d at 718–19. In *Oglala,* the BIA made a decision to transfer the Superintendent of the Bureau's Pine Ridge Agency to another office location when his brother won the position of Tribal President of the Oglala Sioux Tribe. *Id.* at 709–10. The Bureau reasoned that the brother's nomination to the position of Tribal President created a "conflict-of-interest situation as long as his brother held the post of Agency Superintendent." *Id.* at 710. In holding that the BIA's determination was "arbitrary, capricious .... (and) otherwise not in accordance with the law," the Eighth Circuit found that the Bureau's decision was based "on general Civil Service regulations in violation of [§ ] 12 of the Indian Reorganization Act of 1934 ..." *Id.* at 714. In addition, the court held that the decision to remove the Agency Superintendent "pursuant to a previously unannounced conflict-of-interest policy contravenes both the letter and the spirit of the Bureau's consultation guidelines." *Id.* at 718–19. In explaining its holding, the Court stated:

> By holding that the Bureau failed to comply with its own procedures, we are not, as the government asserts, holding that the Oglala Sioux Tribe is entitled to a superintendent of its choice. We hold only that where the Bureau has established a policy requiring prior consultation with a tribe, and has thereby created a justified explanation on the part of the Indian people that they will be given a meaningful opportunity to express their views before Bureau policy is made, that opportunity must be afforded. Failure of the Bureau to make any real attempt to comply with its own policy of consultation not only violates those general principles which govern administrative decisionmaking, ... but

also violates 'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.'

*Id.* at 721 (citations omitted).

The current situation differs considerably from the situation facing the court in *Oglala*. Here, the Nation has blatantly disregarded the requirements of its own Constitution and sought to exclude: long-time members of its own tribe from seeking office, and participating on the General Council. Although the DOI has for many years acquiesced in this unconstitutional exclusion, that does not prevent the DOI from trying to correct the problem once it became aware of the error. *See King v. Norton*, 160 F.Supp.2d 755, 761 (E.D.Mich. 2001) (holding that BIA had authority to reconsider and reverse its prior decision regarding the number of valid signatures sufficient to require an election where it later determined that the prior decision was the result of a mathematical error, "detrimental reliance by a party will not prevent an agency's reconsideration of a decision if the initial decision is in fact erroneous.") (citation omitted). As the Nation's Constitution now exists, the requirement of one-quarter degree Seminole blood violates Article IV, § three of the Seminole Constitution. And, "[n]either the Secretary, nor the Indians themselves, may ignore the express provisions of the constitution." *Milam*, 10 ILR at 3017.

■ However, at oral argument, plaintiff's counsel noted that the Bands at issue have each held new elections that required

one-quarter Indian blood to run for office on the General Council. Admin.R.Doc. 37. In light of this fact, it appears that the defendants are not justified in requesting all new Band elections, as many have purportedly now been properly conducted. The Court will therefore order that the defendants recognize those members of the General Council who were elected in accordance with the Constitutional prerequisite of one-quarter Indian blood. And, while the Court is sympathetic to the government's concern regarding all of the Band elections that were conducted pursuant to the unconstitutional requirement, absent evidence that there were candidates who would have run, but did not run for General Council positions as a result of the unconstitutional requirement, the Court concludes that the Nation's sovereignty and right to self-determination overrides the DOI's legitimate concern about the stated blood-line requirement, and that its refusal to recognize Band elections where a specific challenge has not been registered must be declared contrary to law. *See Ransom*, 69 F.Supp.2d at 150, (when resolving issues regarding what tribal entity to recognize, the government must do so in "harmony with the principles of tribal self-determination." (citation omitted); *Wheeler v. U.S. Department of Interior*, 811 F.2d at 551 (same).

### C. The Act of 1970

■ The final issue before the Court is whether the DOI has violated the Act of 1970 by continuing to recognize Jerry Haney as the Nation's Chief.[21] The Act of

21. During oral argument, plaintiff's counsel argued the elections for General Council and for Principal Chief and Assistant Chief are severable, and therefore, the Court could order the DOI to recognize the General Council without recognizing the Principal and Assistant Chiefs. The Court does not agree because the Principal Chief is empowered, pursuant to the Seminole Constitution, to conduct a variety of actions regarding the General Council, such as the right to call meetings, Seminole Const., art. VI, § 1, and the right to vote when the General Council is deadlocked due to a tie vote, *id.* art. III, § 5. These functions by the Principal Chief make him an integral part of the operations of the General Council and therefore the elections are not severable.

1970 "came at a time when federal Indian policy had once again reversed itself, this time in favor of tribal self-government." *Harjo*, 420 F.Supp. at 1139. The Act provides in pertinent part:

> That, notwithstanding any other provisions of law, the principal chiefs of the Cherokee, Choctaw, Creek, and Seminole Tribes of Oklahoma and the governor of the Chickasaw Tribe of Oklahoma shall be popularly selected by the respective tribes in accordance with procedures established by the officially recognized tribal spokesman and or governing entity. Such established procedures shall be subject to approval by the Secretary of the Interior.
>
> Sec. 2. The Secretary of the Interior or his representative is hereby authorized to assist, upon request, any of such officially recognized tribal spokesman and/or governing entity in the development and implementation of such procedures.

84 Stat. 1091; Admin.R.Doc. 9 at 6.

Article III, § 3 of the Seminole Constitution provides that the "Chief and Assistant Chief shall be elected for a term of four years ... *and shall serve until their successors have been elected and installed.*" (emphasis added). The Court agrees with the DOI that the Nation's Constitu-tion supports its position that this language presupposes that there has been a legitimate election,[22] the result being the election of a new Principal Chief who can legally assume that office.[23] As the July 2001 election did not include the votes of the Freedmen, the election was unlawful as the Freedmen are entitled to full participation in the Nation. *See Seminole I*, at 6 ("DOI's ensuing decision not to recognize actions of the Seminole Nation in the absence of the Freedmen was not arbitrary and capricious.").

In addition, the Court agrees with the defendants and plaintiff-intervenor Haney that the tribal resolution that sought to remove him was procedurally infirm. The Nation's Constitution requires that nineteen members of the Council vote to remove Haney; yet only sixteen members in fact voted to do so. At oral argument, plaintiff acknowledged that nineteen votes were needed to remove Haney, but not for suspension, thus implying that sixteen votes were sufficient to accomplish that objective. However, there is no constitutional provision that authorizes the suspension of the Chief. Moreover, plaintiff has not directed the Court to any other authority, tradition, or custom that authorizes the suspension of the Chief or if such a procedure does exist, what number of votes are needed to suspend the Principal

**22.** Plaintiff appears to concede that the BIA "has a responsibility to interpret tribal law when necessary to carry out the government-to-government relationship with the tribe[,]" and that the "BIA should have read the Seminole Nation's constitution and sought a solution that conformed with tribal law." Pl.'s Reply at 11. It appears to the Court that this is precisely what the defendants have sought to do. The Nation's Constitution contains procedural requirements that the plaintiff has failed to adhere to. Therefore, the BIA has not been derelict in its duty to ensure that those constitutional mandates are followed.

**23.** Although the General Council is empowered, pursuant to Article IX, § four, of the Seminole Constitution to "appoint the Chief and Assistant Chief until a special election is held ..." this authority is triggered only upon the "death or resignation or removal of both the Chief and Assistant Chief ..." As the Court has concluded that Jerry Haney was not properly removed from his position as Principal Chief, and, in any event, due to the fact that James Factor was never removed from his position as Assistant Chief, the Court concludes that the General Council's authority pursuant to Article IX, § four has not been triggered into action. Additionally, even if Jerry Haney had validly been removed from his position, Article IX, § 3 of the Seminole Constitution provides that the Assistant Chief is thereafter to be confirmed as Chief.

Chief. In any event, the resolution that attempted to remove Jerry Haney was adopted by a General Council that was constituted without the participation of the Freedmen and therefore was not recognized by the DOI. As stated previously, the Department has the responsibility to ensure that the Nation adheres to its own constitutional mandates and that any removal of the Principal Chief is achieved in accordance with those procedures. *See Milam*, 10 ILR at 3016 (holding BIA violated the APA when it recognized actions of Seminole General Council in removing the Principal and Assistant Chiefs when the council failed to adhere to the Seminole Constitution in issuing notice to council members regarding the meeting at which the resolution to remove the Chiefs was ratified).

Throughout its reply, plaintiff argues that this case is about its right to self-determination, and that "[e]ven if the election results were tainted ... because the Freedmen votes were not tabulated, it is unequivocal that the Seminole people did not want Jerry Haney as their Principal Chief." Pl.'s Reply at 8. However, this argument ignores the fact that the "Secretary of the Interior is charged not only with the duty to protect the rights of the tribe, but also the rights of individual members. And the duty to protect these rights is the same whether the infringement is by nonmembers or by members of the tribe." *Milam*, 10 ILR at 3017. The fact that a segment of the Nation was unlawfully excluded from participating in the election for Principal Chief and Assistant Chief is sufficient justification for the Secretary not to recognize the results of that election.

■■■ Therefore, the Court finds that the DOI has not violated the Act of October 1970 by continuing to recognize Mr.

Haney as the Nation's Principal Chief. Mr. Haney was not lawfully removed from office according to the requirements of the Nation's constitution and, Mr. Haney was not defeated in a valid election because the Freedmen were excluded from participation in the July 2001 election. The Act of 1970 "was passed to permit the members of the Five Civilized Tribes of Oklahoma to select their own principal chiefs or governors, rather than accepting such appointments by the Secretary of the Interior." *Morris v. Watt*, 640 F.2d 404, 410 n. 12 (D.C.Cir.1981); *Harjo*, 420 F.Supp. at 1141 (citing legislative report regarding the Act of 1970). However, the Court concludes that the Act presupposes that all members of the Nation had the opportunity to participate in this selection process. *See Morris*, 640 F.2d at 415 (remanding case to district court where there had been "a general failure on the part of the Choctaw and Chickasaw governments to allow tribal members to decide basic questions concerning any fundamental changes in the proposed new Constitutions."). Thus, the DOI has not violated this Act by merely insisting that the Freedmen, as members of the Nation, have the opportunity to vote for the Principal Chief of their choice.

The Court acknowledges and appreciates the importance of the Nation's right, as a sovereign body, to self-determination and self-government. However, as a sovereign, the Nation has the duty and the responsibility to respect the rights of all of its members, including the rights of its minority members, as guaranteed by the Nation's Constitution. *See* Seminole Constitution Art. II ("The membership of this body shall consist of all Seminole citizens whose names appear on the final rolls of the Seminole Nation of Oklahoma approved pursuant to section 2 of the Act of April 26, 1906 ...).[24] And, where the Na-

---

**24.** In *Seminole I,* Judge Kollar–Kotelly explicitly rejected the Nation's argument that the

Freedmen roll had not been approved by the

tion evidences that it does not intend to respect those rights, the government, as part of "the distinctive obligation of trust incumbent upon [it] in its dealings with these dependent and sometimes exploited people," *Seminole Nation*, 316 U.S. at 296, 62 S.Ct. 1049, (citations omitted), has a duty to ensure that its minority members are protected against the will of the majority that is being imposed in violation of its own Constitution. The United States has itself dealt with many of these same issues, where, if the will of the majority had prevailed, many minority members of this society would not have been able to enjoy the same privileges and benefits as other citizens. Where the Nation will not protect the Constitutional rights of its minority members, the BIA has the responsibility and indeed, the duty, to intervene and attempt to protect those rights through appropriate remedies. *Id.* at 296–97, 62 S.Ct. 1049.

### IV. *The Remedy*

The Court would like to believe that its decision will resolve, or at least be a positive step toward resolving the long-existing turmoil and contention that exists between the parties, and the Nation and the Freedmen. This, the Court fears, will not be the result. Rather, the Court is confident that, no matter what it decides, or for that matter what the Circuit Court may ultimately decide since it is inevitable that this case will be appealed, that internal rifts within the Seminole Nation and friction between the Seminole Nation and the DOI will continue. Nonetheless, despite this pessimism, the Court must try to fashion a remedy that addresses the dispute before it, and each party has submitted proposed orders suggesting the course of action that should be taken at this point.

■ The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *Ransom,* 69 F.Supp.2d at 149. "Since the Court decides this case under the jurisdiction afforded [to] it by the APA, it cannot issue an order compelling a certain form of government upon the [Nation]." *Id.* at 149 n. 8. Thus, this Court is caught in the uncomfortable predicament of having to uphold the DOI's refusal to recognize the newly elected Chief, Assistant Chief, and General Council, while at the same time doing all it can to protect the Nation's right to self-determination. *See Harjo*, 420 F.Supp. at 1144 ("it would be highly anomalous in a case in which the underlying claim is one of self-determination for the Court to vindicate that right by simply mandating the creation of some particular sort of institution or government."). With this difficult, if not impossible, task thrusted upon it, the Court finds as follows:

(1) The defendants have not acted arbitrarily, capriciously, or contrary to law by concluding that the July 2001 election for Principal Chief and Assistant Chief was unlawful because the votes of the Freedmen were not tabulated in determining who should be elected to those positions.

(2) The defendants have not acted arbitrarily, capriciously, or contrary to law by concluding that the July 2001 elections for General Council members in those Bands where there has been evidence submitted to the DOI that potential candidates did not run for office due to the one-quarter degree Seminole blood requirement to seek office for those positions, which was in violation of the Seminole Constitution

---

Secretary of the DOI. *Seminole I,* at 6. "As a result, Plaintiff's reliance upon the Act of

April 26, 1906, is without effect." *Id.*

that actually required one-quarter degree Indian blood to be a candidate, are invalid.

(3) The DOI must recognize forthwith those General Council members who have been elected pursuant to the valid one-quarter degree Indian blood requirement.

(4) Defendants have not violated the Act of 1970, and will not do so by continuing to recognize Jerry Haney as Principal Chief of the Nation until such time as the Nation either holds a new election for Chief, in which the Freedmen are permitted to vote, or a legally constituted General Council removes Mr. Haney, in the manner required by the Nation's Constitution.

An order consistent with this Memorandum Opinion accompanies this opinion.

### *ORDER*

For the reasons set forth in the Memorandum Opinion that accompanies this order, it is hereby

**ORDERED** that Plaintiff's Motion for Summary Judgment [# 36] is hereby granted in part and denied in part.[1] It is further

1. The defendants acted contrary to law by refusing to recognize the Nation's General Council members absent evidence that there were candidates that would have run for those positions but for the unconstitutional one-quarter Seminole blood requirement. On the other hand, the defendants have not violated the Act of 1970 by continuing to recognize Jerry Haney and James Factor as the Principal Chief and Assistant Chief of the Nation and may continue to do so until such time as new elections are held in which the Freedmen are permitted to vote and their votes are counted in determining the winning candidates.

2. The defendants do not have to recognize the General Council as it is now constituted until the Freedmen's representatives are returned to their positions on the Council. In addition, defendants do not have to recognize further resolutions of the General Council until elections are held for the Freedmen Bands and

**ORDERED** that Defendants' Cross–Motion for Summary Judgment [# 39] is hereby granted in part and denied in part.[2] It is further

**ORDERED** that Plaintiff–Intervenor Jerry Haney shall submit his motion for summary judgment on his complaint that was filed in conjunction with his motion to intervene in this action by September 30, 2002.[3] It is further

**ORDERED** that any oppositions to Plaintiff–Intervenor Jerry Haney's motion shall be submitted by October 7, 2002. It is further

**ORDERED** that any reply to the oppositions shall be filed by October 11, 2002.

the other Bands where evidence has been submitted to the DOI that candidates would have run for Council positions absent the unconstitutional one-quarter Seminole blood requirement. The defendants have not violated the Act of 1970 by continuing to recognize Jerry Haney and James Factor as the Principal Chief and Assistant Chief of the Nation and may continue to do so until such time as new elections are held in which the Freedmen are permitted to vote and their votes are counted in determining the winning candidates.

3. Mr. Haney has filed a separate action with this court, *Seminole Nation v. Norton*, civil action number 02–1057. It appears that the relief sought in that case is identical to the relief being sought in his complaint that was filed in this case. Accordingly, Mr. Haney shall advise the Court by September 30, 2002, why this other case should not be dismissed.